**Anne DEY, Plaintiff–Appellant,**

v.

**COLT CONSTRUCTION & DEVELOPMENT COMPANY, Defendant–Appellee.**

**No. 93–2053.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1993.

Decided July 11, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 26, 1994.

---

Solomon I. Hirsh, Chicago, IL (argued), for plaintiff-appellant.

Arthur L. Klein (argued), Paul E. Starkman, Elliott G. Smith, Arnstein & Lehr, Katherine A. Williams, Lamet, Kanwit & Davis, Chicago, IL, for defendant-appellee.

Before WOOD, Jr., ESCHBACH, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Anne Dey charges that her former employer, Colt Construction and Development Company ("Colt"), violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a)(1) & 2000e–3(a), when its vice president and general counsel sexually harassed her on the job and when its president then terminated her employment only one month after she first complained of that harassment. Dey also maintains that Colt violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), when it paid her male successors more than she had been paid for similar work. The district court granted Colt's motion for summary judgment on all of Dey's claims, and she now appeals. For the reasons that follow, we reverse and remand for a trial on the Title VII claims but affirm the grant of summary judgment on Dey's claim under the Equal Pay Act.

## I. BACKGROUND

Dey began working for Colt, a building and construction concern located in Skokie, Illinois, on April 19, 1982. She was hired as the company's bookkeeper, but she was thereafter given the title of "controller." She was responsible, *inter alia,* for maintaining Colt's payroll, its payables and receivables, for making disbursements to subcontractors and construction material vendors, for paying office expenses, documenting project costs, and preparing affidavits, waivers of mechanic's liens, union reports, and reports for the Department of Housing and Urban Development. Dey also prepared Colt's payroll tax returns, although its income tax returns and its year-end financial statements were prepared by an outside accountant based on data and schedules compiled by Dey.

The office in which Dey worked primarily housed Colt's management personnel and not its field staff. In addition to Dey, the office included Colt's president and owner, Robert Irsay; its executive vice president, James Ferguson; its vice president and general counsel, Michael Chernoff; one or two salespeople and estimators; and two or three support personnel. In September 1984, Dudley Sullivan joined the office as president of Colt Realty and Development Company ("Colt Realty"), a separate real estate development company also owned by Irsay. Dey was supervised by Ferguson, but she occasionally worked with Chernoff on collection, insurance, and other special matters. She also received some projects directly from Irsay. Dey was aware throughout the period of her employment with Colt that Irsay had final decision-making authority on all company matters.

Dey charges that near the end of 1982 or early in 1983, Chernoff began subjecting her to almost daily comments, gestures, and innuendo that she considered sexually suggestive and harassing. Although she worked directly with Chernoff only on occasion, she had limited, daily contact with him whenever he was in town because of the size of Colt's office. Dey is unable to remember the specifics of much of the alleged harassment, but she recounts in some detail the following five incidents: (1) in talking with Dey sometime in either 1983 or 1984, Chernoff referred to a female attorney with whom he was then working on a Colt project as a "flat-chested cunt"; (2) when Dey returned from a Phoenix vacation in January 1983, Chernoff suggested she had not gotten a tan because she had spent the week on her back in bed; (3) when Dey and Chernoff were commenting one day between November 1982 and September 1983 on the strong body odor of Chernoff's secretary, Chernoff stated that he "would eat [Dey] no matter how [she]

smelled"; (4) in March or April 1985, after more than two years of alleged harassment, Dey and Chernoff were riding alone on an elevator from Colt's fourth-floor offices to the basement parking garage when Chernoff asked Dey to hold some papers for him; he then unzipped his slacks, whereupon Dey turned her back until the elevator reached the basement; Dey heard Chernoff unzip and then zip his slacks, although Chernoff did not say anything and did not touch Dey during this incident; she later indicated that she had felt trapped and "very afraid"; [1] and (5) in September or October 1985, Chernoff said to someone on the telephone that "there is a girl in my office going down on me" as Dey leaned down to put some documents on Chernoff's floor. Dey maintains that these five incidents stand out in her memory as the most blatant but that Chernoff made similar harassing comments on almost a daily basis. Although Dey can describe the circumstances of some further incidents, she is unable to recall specifically what Chernoff may have said or done. There was no physical component to the alleged harassment, however, as Dey concedes that neither Chernoff nor anyone else at Colt ever touched her in a sexually suggestive manner or intimated that sex was a *quid pro quo* for continued employment or advancement with the company.

Subsequent to the zipper incident on the elevator, Dey described Chernoff's behavior to a male friend, who told Dey that there were laws to protect women against this "sort of thing" and that his own company would not tolerate similar conduct from one of its employees. Dey apparently was unaware prior to this conversation that she had any legal rights or recourse. She had instead simply tolerated Chernoff's conduct so as not to jeopardize her job. According to Dey, Colt had no formal rules or procedures relating to sexual harassment complaints.

Shortly after the conversation with her friend, Dey reported Chernoff's conduct to her supervisor Ferguson. She indicated that she was uncomfortable and embarrassed by Chernoff's comments and that she intended to start a log, recording those incidents she considered particularly offensive. Ferguson later reported that Dey appeared upset during this conversation. After talking to Ferguson, Dey complained to Chernoff directly, indicating that his comments and other conduct made her "very uncomfortable," that she intended to keep a log of his conduct, and that she hoped her objections would discourage any similar behavior in the future.[2] Chernoff denies that this conversation ever took place. Dey reports, however, that after her complaints to Ferguson and Chernoff, the conduct subsided for a time before resuming, albeit less frequently and less blatantly, a month or two later. Indeed, it was months after Dey had complained that Chernoff made the "girl in my office going down on me" comment. Dey had one further conversation with Ferguson about the alleged harassment in April 1985, in which she asked whether Ferguson had made any progress on her complaint. Ferguson assured Dey that he was working on it. Dey never approached Irsay directly with her complaints, however, and she concedes that she does not know whether Ferguson or Chernoff ever mentioned the problem to Irsay.

Dey maintains that Chernoff's conduct upset and embarrassed her and made her feel uncomfortable in the office, although she was still able to fulfill her job responsibilities in a timely fashion. She indicates that Chernoff's comments affected her attitude and at times caused her simply to walk out of his office. She states that she just wanted the comments to stop. Dey never consulted a physician for any psychological problems resulting from Chernoff's conduct, however.

Although Chernoff's conduct caused her considerable discomfort, Dey considered everyone in the office, including Chernoff, to be her friend, and she characterized the office environment as professional, with the exception of Chernoff's consistent sexual commentary. She did not socialize with Chernoff

---

1. Dey subsequently recorded in her log that Chernoff may have been tucking in his shirt.

2. Dey proceeded to keep a log in which she recorded the "most blatant" of Chernoff's alleged indiscretions. She included in that log earlier comments and conduct insofar as she could remember them, as well as conduct that occurred thereafter.

outside the office, although she sometimes had lunch with him and attended office luncheons and other office social functions where Chernoff was present. Dey did on two occasions receive personal, legal advice from Chernoff during office hours—once in relation to a personal injury lawsuit in which she had sued the manufacturer of a defective birth control device, and once when Chernoff offered to review a proposed contract for the purchase of an automobile after Dey had considered but ultimately declined to purchase Chernoff's own automobile. Finally, Dey once requested Chernoff's assistance when a woman appeared at the office demanding to speak with Dey about her alleged relationship with the woman's husband. When the receptionist could not persuade the woman to leave, Dey called upon Chernoff because she thought the woman might have a gun, and Chernoff was able to convince the woman to leave.[3]

Toward the end of April 1985, Ferguson met with Dey for her annual salary review and told her that her weekly salary would be raised from $475 to $500. This $25 per week raise was consistent with what she had received in prior years. Dey thought she was entitled to a larger raise to account for her growing responsibilities, and she subsequently took the matter up with Irsay, who ultimately agreed to a $60 per week raise. Irsay now explains that this raise was not performance-based and that he had agreed to it only to placate Dey because he was not yet in a position to replace her.

Less than two weeks later, Irsay held a closed-door meeting with Chernoff and Sullivan in which they agreed that Dey would be terminated. Irsay maintains that he made the decision independently, that he merely asked Chernoff and Sullivan for their opinions, and that they concurred in his decision.

That decision apparently was based on Irsay's personal assessment of Dey's performance, as well as on complaints Irsay had received about Dey from Sullivan, Ric McCoy (a Colt field superintendent), and other office personnel. The complaints ranged from comments about Dey's uncooperative attitude to charges that she was unable to complete her required tasks promptly.[4] Irsay allegedly talked to Dey about these shortcomings on a number of occasions, although Dey denies that Irsay ever complained about her work. Irsay also insists that he knew nothing of Dey's sexual harassment charges when he decided to terminate her employment. Both Ferguson and Chernoff maintain that they never mentioned Dey's complaints to Irsay. Indeed, Chernoff denies that Dey ever complained to him in the first place.

Although Irsay decided to fire Dey in May 1985, she was not notified of that decision until November 15, after Irsay had found her replacement. Thus, when Dey asked Irsay in September 1985 whether her job was secure because she was contemplating the purchase of a new automobile, Irsay assured her that it was and added that she did not even have to ask. According to Dey, this was consistent with Irsay's general attitude toward her work; he never complained but occasionally indicated that he was pleased with her performance. Dey maintains that she also received only constructive criticism from Chernoff and Ferguson, and Ferguson adds that neither Irsay nor Chernoff ever complained to him about Dey's job performance.

After Irsay decided to terminate Dey, Sullivan recommended that he hire a replacement with experience in real estate investment who could act as a financial and investment advisor, as well as a controller. Irsay authorized Sullivan to search for such a can-

---

3. This incident occurred sometime near the end of 1984. It is unclear when Chernoff provided Dey with advice on her pending lawsuit, but he reviewed the automobile contract for Dey in September 1985.

4. It is undisputed that Dey had difficulties with both Sullivan and McCoy. Dey admits to a number of confrontations with Sullivan, but she maintains that his requests on those occasions either contravened company policy or the specif-

ic instructions of her superiors. As for McCoy, a former subcontractor who eventually became a Colt employee, Dey attributes their difficulties (based primarily on Dey's refusal to issue McCoy personal expense checks) to the fact that she was not promptly advised when McCoy was made a Colt employee. Once she was so advised, she issued the expense checks, provided that McCoy complied with the proper procedures, which he rarely did.

didate, and Sullivan eventually recommended that Irsay hire Larry Gagnon, a CPA with an MBA who had previous experience as an assistant controller of a publicly-held corporation. Gagnon's duties with Colt included the day-to-day accounting work that Dey had performed, but unlike Dey, he also was responsible for preparing the company's tax returns, computerizing its financial records, and analyzing and providing advice on possible real estate investment opportunities. Colt hired Gagnon in October 1985 at a salary of $50,000 per year, and he began working for the company on November 18.

Acting on Irsay's instructions, Chernoff met with Dey on November 15 and told her of her immediate termination. Chernoff explained to Dey that he, Sullivan, and Ferguson had found her increasingly difficult to work with in the past six months and that the company's business had slowed. Chernoff never mentioned Dey's harassment complaints in the course of this meeting, and no one ever suggested to Dey that she was fired in response to her complaints. At the time of her discharge, Dey was making $27,820 per year.

Although he was Dey's immediate supervisor, Ferguson did not participate in the decision to terminate her employment.[5] Chernoff told Dey when firing her that Ferguson found her difficult to work with, but Ferguson maintains that he never complained to Irsay about Dey, and he further attests that Dey was adequately performing her duties at the time of her discharge and that he knew of no problems between Dey and other Colt employees. With regard to specific conflicts between Dey and either Sullivan or McCoy, Ferguson corroborates Dey's version of those events and indicates that she had acted appropriately.

Gagnon subsequently left Colt in March 1986 to buy his own business, and he was replaced on May 1 by Steven Maloney, whose credentials were less impressive. Maloney had an MBA but had failed to pass the CPA exam. He also was about to be laid off by his then employer, Allnet Communications Services ("Allnet"). Colt initially offered Maloney an annual salary of approximately $30,000, but it ultimately agreed to pay him $32,400, which is what Maloney had been making at Allnet. After six months, Colt increased Maloney's salary to $34,020. Maloney's responsibilities were more limited than Gagnon's and, for the most part, were comparable to those of Dey. For example, unlike Gagnon but like Dey, Maloney did not work for Sullivan on Colt Realty matters. Unlike Dey, however, Maloney was authorized to execute affidavits and waivers of mechanic's liens on Colt's behalf, whereas Dey needed the signature of a company officer on such documents. Moreover, Maloney also was charged with completing the computerization of Colt's financial records, a process begun by Gagnon. There was some question, however, as to the extent of Maloney's technical knowledge, as Sullivan admits that Maloney knew nothing of computers other than the location of the on-off switch.

After her discharge, Dey filed a complaint with the Equal Employment Opportunity Commission and then filed this action in federal court. Her initial complaint below alleged sexual harassment and Equal Pay Act claims against Colt as well as a tortious interference with contract claim against Chernoff. Dey subsequently abandoned the tortious interference claim, but she added allegations that Colt had violated Title VII by terminating her employment in response to her sexual harassment charges.

Colt moved for summary judgment, and the district court referred the motion to Magistrate Judge Joan B. Gottschall, who recommended that the sexual harassment and retaliation claims proceed to trial. As to the Equal Pay Act, the magistrate judge recommended that summary judgment be granted as to the pay disparity between Dey and Gagnon but that factual issues precluded summary judgment as to Maloney's higher salary. Colt objected to these recommendations, and after a de novo review, the district court concluded that Colt was entitled to summary judgment on all claims.

---

5. Irsay explains that Ferguson was gradually relieved of any supervisory role in Colt's construction projects and that he eventually left the company in 1986.

## II. DISCUSSION

■ In this appeal, Dey maintains that when the evidence is viewed in its most favorable light, it supports her claim of a hostile work environment, as well as the claim that she was discharged unlawfully in retaliation for complaining of Chernoff's conduct. She further argues that summary judgment was unwarranted on the Equal Pay Act claim because there are disputed issues of material fact on Colt's affirmative defenses under that statute. We review the district court's grant of summary judgment on each of these claims de novo, construing the evidence in the light most favorable to Dey and according her the benefit of all reasonable inferences. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 532 (7th Cir.1993).[6] Our task is to determine whether there is any disputed issue of material fact that requires a trial. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994).

### A. Sexual Harassment

■ Dey maintains that Chernoff's repeated use of sexually-explicit commentary and sexual innuendo created a hostile and abusive work environment for Title VII purposes. Dey does not advance a *quid pro quo* harassment theory, as she admits that no one at Colt linked an economic benefit to her participation in conduct of a sexual nature. *See, e.g., Docktor v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990). But as the Supreme Court explained in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986), Title VII addresses more than simply economic or tangible discrimination; it instead reaches "the entire spectrum of disparate treatment of men and women in employment," which includes conduct having "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (internal quotations omitted). *See Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1004 (7th Cir.1994); *Saxton*, 10 F.3d at 533. The Court reaffirmed this principle in *Harris v. Forklift Sys., Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), and reiterated that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." (Quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06);[7] *see also Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir.1994), *cert. denied*, —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

In *Harris*, the Court developed a non-exhaustive list of factors relevant to the somewhat elusive question of whether a work environment has been rendered hostile or abusive. All of the circumstances should be considered, the Court said, but we must be particularly concerned with "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, —— U.S. at ——, 114 S.Ct. at 371; *see also Saxton*, 10 F.3d at 534. Although the presence or absence of psychological harm or an unreasonable effect on work performance are relevant and may be considered, "no single factor is required." *Harris*, —— U.S. at ——, 114 S.Ct. at 371; *Saxton*, 10 F.3d at 534 & n. 14; *see also Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir. 1993).

---

**6.** The preceding factual discussion accordingly describes the facts in the light most favorable to Dey.

**7.** In *Harris*, the Court rejected the rule in some circuits that an employee must show psychological harm to succeed on a hostile environment claim, explaining that the *Meritor* standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." —— U.S. at ——, 114 S.Ct. at 370. We observed in *Saxton* that *Harris* effectively overrules our earlier decisions to the extent they required a showing that the harassment " 'cause[d] such anxiety and debilitation to the plaintiff that working conditions were poisoned.' " 10 F.3d at 533 & n. 12 (quoting *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir.1986)).

*Harris* also makes clear that we must evaluate the relevant factors from both an objective and subjective viewpoint:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

—— U.S. at ——, 114 S.Ct. at 370; *see also id.* at ——, 114 S.Ct. at 371. We thus consider not only the actual effect of the harasser's conduct on his victim, but also the effect similar conduct would have had on a reasonable person in the plaintiff's position. *Saxton,* 10 F.3d at 534; *see also Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1271–72 (7th Cir.1991); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 419 (7th Cir.1989).[8]

Here, the district court focused on the subjective prong, concluding that Dey had not shown any subjective effect from Chernoff's conduct. In other words, the district court determined that Dey had not subjectively perceived her work environment to be hostile or abusive. The court emphasized that Chernoff's conduct had not prevented Dey from performing her assigned tasks and that she had generally described the atmosphere at Colt as "professional." The court also observed that Dey had not consulted a physician for any psychological problems relating to the alleged harassment, nor had Chernoff's conduct prompted Dey to quit, to avoid the office, or even to react angrily. Dey had instead, in the court's words, "maintained a close relationship with Chernoff." Indeed, she had considered buying his automobile, had asked him for legal advice on a personal matter, and had gone to him for protection when a male friend's wife unexpectedly appeared at the office. The court

concluded from this evidence that Dey had voluntarily associated herself with Chernoff, thereby negating any inference that she found his conduct to be either hostile or abusive.

### 1. Subjective viewpoint

We respectfully disagree with the district court's conclusion that Dey has failed to establish a subjectively hostile work environment as a matter of law. Although Dey indicated in her deposition that Chernoff's daily sexual banter did not prevent her from fulfilling her responsibilities in a timely fashion, she also stated that the conduct upset and embarrassed her, and made her feel uncomfortable.[9] Indeed, she maintained that on more than one occasion, Chernoff's comments caused her to walk out of his office. Although she tolerated the conduct for over two years because she feared for her job, Dey also indicated that she just wanted the comments to stop. Moreover, once a friend told Dey that there was some legal recourse available to her, Dey complained both to her immediate supervisor, who indicated that she was visibly upset at the time, and to Chernoff himself. Dey also determined to keep a log of any further incidents. These reactions are inconsistent with the district court's view of a woman who was unbothered by Chernoff's offensive banter to such an extent that she voluntarily associated herself with her alleged harasser. This evidence is at least sufficient to create a factual issue on the question of whether Dey subjectively perceived her work environment to be hostile and abusive.

■ In our view, the mention in *Harris* of an unreasonable interference with work performance was not intended to penalize the employee who possesses the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive sexual banter from one of her superiors. As Justice Scalia separately explained in *Harris,* the

---

8. Under the EEOC's proposed regulations, this "reasonable person" standard would include "consideration of the perspective of persons of the alleged victim's race, color, religion, gender, national origin, age, or disability." 58 Fed.Reg. 51266, 51269 (proposed 29 C.F.R. § 1609.1(c)).

9. Although she also described her Colt colleagues as "professional," she excepted Chernoff from that general description.

test under Title VII "is not whether work has been impaired, but whether working conditions have been discriminatorily altered." —— U.S. at ——, 114 S.Ct. at 372 (Scalia, J., concurring). Adhering to that view, we have similarly emphasized that a plaintiff in Dey's position need not show that a campaign of harassment interfered with her work performance in order to establish a violation of Title VII. *Saxton,* 10 F.3d at 534 n. 14. As the Federal Circuit has aptly observed, the fact "[t]hat women who are the objects of discriminatory behavior because of their sex are able to maintain satisfactory job performance is not grounds for denigrating their concerns. *The criterion is not what a reasonable woman employee is capable of enduring, but whether the offensive acts alter the conditions of employment." King v. Hillen,* 21 F.3d 1572, 1583 (Fed.Cir.1994) (emphasis added) (citation omitted). That test can certainly be met even where job performance is not tangibly affected. The absence of a noticeable decline in job productivity should therefore not be unduly emphasized where there is ample evidence showing that the campaign of harassment had an impact on its target and made it more difficult for her to do her job. *See Harris,* —— U.S. at ——, 114 S.Ct. at 372 (Ginsburg, J., concurring); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1462–63 (9th Cir.1994).

The district court also was swayed by what it characterized as the "close relationship" Dey maintained with Chernoff. The court's finding was based on the fact that Dey considered buying Chernoff's automobile, that she once asked him for legal advice and permitted him to review a contract for her on

another occasion, and that she asked him for help when her friend's wife unexpectedly appeared at the office. But in our view, the court's finding reflects a view of the evidence that is favorable to Colt, and not to Dey.

Viewing the evidence in Dey's favor, it is certainly conceivable that a woman in her position would ask the only lawyer in an office of fewer than ten employees for legal advice even if she knew and had retained other lawyers. That situation seems to us no different from seeking a second opinion on a financial matter if there happens to be an accountant who works in the office. Nor does the fact that Dey was at one point interested in purchasing Chernoff's automobile necessarily undermine her position. A reasonable fact-finder would not necessarily expect Dey to completely disassociate herself from Chernoff, particularly in light of the fact that he was second in command to Irsay in an office with only three executives. Turning her back and having nothing further to do with Chernoff was, in all likelihood, not an option if Dey wished to keep her job, regardless of how offensive she may have found his behavior. Dey's job instead required that she work with Chernoff on occasional projects and have almost daily contact with him. *Cf. King,* 21 F.3d at 1583.[10] The incidents relied on by the district court, when viewed in the light most favorable to Dey, simply do not establish that Dey sought to maintain a close personal relationship with Chernoff.[11] They do not necessarily contradict her assertions that Chernoff's conduct consistently upset and embarrassed her and ultimately caused her to attempt to avoid him in the office after April 1985. For these

---

10. Colt, after all, had no established procedure for dealing with complaints of sexual harassment in the workplace. *See* 58 Fed.Reg. 51266, 51269 (proposed 29 C.F.R. § 1609.2(d) ("An employer should provide an effective complaint procedure by which employees can make their complaints known to appropriate officials who are in a position to act on them.")).

11. We also are unpersuaded by the district court's reliance on *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986). Although the court there found it significant that Scott had considered her alleged harasser to be a "friend," its decision rested primarily on the fact that the alleged harassment was not "so pervasive or

psychologically debilitating that [it] affected Scott's ability to perform on the job." *Id.* at 214. Under *Harris,* such an effect is not required. (*See supra,* at 1454–55.) Where there is other evidence suggesting that a Title VII plaintiff found her work environment to be subjectively hostile and abusive, undue emphasis should not be accorded a deposition statement that the plaintiff considered everyone in the office, including her alleged harasser, to be a friend. Despite that appellation, Chernoff's conduct still upset Dey to such an extent that she complained directly to him and to Ferguson once she was apprised of her legal rights. *Cf. Scott,* 798 F.2d at 212 (Scott never complained to any supervisory personnel about the alleged harassment).

reasons, we think a reasonable fact-finder could determine that Dey subjectively perceived the Colt environment to be hostile and abusive.

### 2. Objective viewpoint

■ Although the district court rested its decision on the subjective aspect of our two-pronged inquiry, Colt also contends that Dey has failed to satisfy the objective prong. It argues that the incidents of harassment alleged here were too isolated and innocuous to be actionable. Colt's argument finds support in our cases. Indeed, in *Saxton,* we reaffirmed that " 'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim." 10 F.3d at 533; *see also Rennie v. Dalton,* 3 F.3d 1100, 1108 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993); *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 214 (7th Cir.1986). Indeed, *Harris* itself makes plain that an offensive utterance alone would not give rise to a Title VII claim because it would not sufficiently affect the terms and conditions of the plaintiff's employment. — U.S. at —, 114 S.Ct. at 370; *see also Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06. Yet a series of such statements, if sufficiently severe and pervasive, could give rise to an objectively hostile work environment under the *Meritor* standard. *See, e.g., Steiner,* 25 F.3d at 1463; *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 403 (5th Cir.1993); *Daniels,* 937 F.2d at 1270 (pervasive pattern of racial jokes sufficient to sustain a hostile environment claim); *Brooms,* 881 F.2d at 420.

In Colt's view, Dey's claim is limited to only five specific incidents of alleged harassment over a two-and-a-half year period, and the company therefore argues that those relatively isolated incidents were neither severe nor pervasive enough to establish a hostile and abusive work environment under Title VII. We might be inclined to agree if not for Dey's additional allegation that those were not the only examples of Chernoff's offensive behavior. But Dey maintains that she was subjected to almost daily comments, gestures, and innuendo of a sexual nature whenever Chernoff was in the office, which by all accounts was at least a majority of the time. Yet because Dey is unable to recite Chernoff's specific comment on each occasion, Colt contends that we are limited to the five incidents she has detailed. But we think there is sufficient evidence in the record to corroborate Dey's charge of ongoing conduct to require a trial on that issue.

Preliminarily, we have no difficulty concluding that the five were extremely offensive incidents and that they would be considered as such by a reasonable person in Dey's position. Chernoff's comments were overtly sexual, and most were directed specifically at Dey, although we do not suggest that more general, gender-related comments would not themselves be actionable under Title VII. *Cf. Daniels,* 937 F.2d at 1274; *see also* 58 Fed.Reg. 51266, 51269 (proposed 29 C.F.R. § 1609.1(d) ("Harassing conduct may be challenged even if the complaining employee(s) are not specifically intended targets of the conduct.")); *Chambers,* 17 F.3d at 1004 (citing proposed regulation). Moreover, the incident on the elevator, which allegedly occurred in March or April 1985, would no doubt be even more frightening to a reasonable woman in Dey's position who, prior to that incident, had endured more than two years of verbal harassment. We find it unsurprising, then, that Dey reacted to the elevator incident the way she did. *Cf. King,* 21 F.3d at 1581 (realistic picture of work environment is not obtained by viewing each incident in isolation); *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993) (court must consider cumulative weight of several "isolated" racial comments); *Daniels,* 937 F.2d at 1274–75 (later acts of racial harassment must be considered in context of ten years of verbal taunting). If Chernoff in fact subjected Dey to similar comments and conduct each day he was in the office, we have no doubt that her work environment could be considered objectively hostile and abusive.

Yet Dey concedes that the aforementioned incidents were the most blatant of those she endured over the two-and-a-half year period, which suggests that Chernoff's daily banter may not have risen to the same level of

severity. But at the same time, Dey indicates that Chernoff's comments were sometimes so severe that they caused her to leave his office. Moreover, although she is unable to remember precisely what Chernoff may have said or done on other occasions, she does recall aspects of those encounters that bear important similarities to the five she has identified. We think this evidence, although admittedly incomplete, may suggest a pattern of conduct which supports Dey's charge that Chernoff's behavior was consistently boorish.

For example, Dey recalls that Chernoff frequently made sexual or otherwise derogatory comments when they were in the presence of other men. She asserts that Chernoff once commented on her posterior when an insurance agent was in his office, although she cannot recall the specific content of the comment. Dey alleges that Chernoff made a similarly suggestive comment to her, again when another man was in his office, and this time asked the man to agree with his comment. Finally, on an occasion when Dey was getting lunch for Chernoff and two other attorneys, Chernoff made a derogatory comment to Dey, although she is unable to remember what he may have said. Furthermore, as evidenced by his comment about the female lawyer, it is clear that Chernoff's feelings for women were not exhibited to Dey alone. For instance, Dey states that she once overheard Chernoff say in a loud voice to someone over the telephone: "Don't talk to the broad—girls are only good for one thing." Finally, in March or April 1985, Dey recalls that she asked Chernoff about the combination of the lock on his briefcase, and he stated that "his numbers would be sixty-nine because if it were seventy-one, that is sixty-nine with two watching." In light of this and similar comments, it is not surprising that Dey would exclude Chernoff in describing Colt's office environment as "professional."

Although Dey's case would certainly be stronger if she could remember more about these and other incidents, what she does recall supports her charge that Chernoff's conduct was consistently offensive and abusive. The credibility of that charge can only be assessed once the factfinder hears Dey's testimony along with all the other evidence. We thus reverse the grant of summary judgment on Dey's sexual harassment claim and remand for trial.

## B. Retaliation

Title VII also makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under that section, Dey must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989); *see also Rennie*, 3 F.3d at 1109; *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992). If she makes that showing, the burden of producing a legitimate, nondiscriminatory reason for her discharge shifts to Colt, and once it does so, Dey bears the burden of showing that Colt's proffered reasons are pretextual and that its actual reason was discriminatory. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir.1991); *Holland*, 883 F.2d at 1313.

### 1. Dey's prima facie case

Colt contends that Dey did not establish a prima facie case of retaliation because she failed to show that she engaged in statutorily protected expression or that there was a causal link between that expression and her discharge. On the first question, our cases hold that an employee may engage in statutorily protected expression under section 2000e–3(a) even if the challenged practice does not actually violate Title VII. *Holland*, 883 F.2d at 1314; *Collins v. State of Illinois*, 830 F.2d 692, 702 (7th Cir.1987); *Jennings v. Tinley Park Community Consolidated*

*School Dist. No. 146,* 796 F.2d 962, 967 (7th Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987). Thus, Dey need not succeed on her sexual harassment claim to make out a prima facie case of retaliatory discharge. Instead, "it is sufficient if the plaintiff has a reasonable belief that she is challenging conduct [that violates] Title VII." *Holland,* 883 F.2d at 1314; *see also Jennings,* 796 F.2d at 967. We have no doubt that Dey had such a belief here when she complained to Ferguson and then to Chernoff about the alleged harassment, as she did so after learning that Chernoff's behavior may violate the law. Even if a trial were to reveal that Dey's work environment was neither hostile nor abusive, that would not affect the sincerity or reasonableness of her belief that Chernoff had acted in violation of the law. *See Holland,* 883 F.2d at 1315; *Collins,* 830 F.2d at 702; *see also Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1182 (7th Cir.1982) ("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case"). As in *Holland,* Dey's allegations of misconduct here were not "utterly baseless." 883 F.2d at 1316. She thus has satisfied the first element of her prima facie case.

The other contested issue is whether Dey has shown a causal link between her complaints of sexual harassment and her eventual discharge. Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity. *See Johnson,* 945 F.2d at 980; *Collins,* 830 F.2d at 705. Here, the decision to discharge Dey was made approximately four weeks after she complained to Chernoff and Ferguson. Moreover, although primarily relevant to the issue of pretext, insofar as Colt cites poor performance as the reason for Dey's discharge, Colt's decision came less than two weeks after Irsay had agreed to give Dey an unusually large raise, and without mentioning any performance deficiencies. The timing of the discharge thus supports the inference of a causal link.

Colt nonetheless argues that such an inference is unreasonable here because the decisionmaker allegedly did not know of the plaintiff's protected activity. We agree that there generally can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity. *See, e.g., Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993); *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012 n. 1 (9th Cir.1983); *see also Jennings,* 796 F.2d at 967. The district court focused on this aspect of Dey's proof in granting Colt's motion for summary judgment, finding no evidence that Irsay knew of Dey's complaints when he decided to terminate her employment. As the district court explained, Irsay denies knowing of any complaints, Dey admits that she said nothing to Irsay, and both Ferguson and Chernoff deny that they ever told Irsay of Dey's complaints. Dey nonetheless argues that because Chernoff was present at the meeting where the discharge decision was made and in fact participated in the evaluation of her performance, we should infer that Chernoff told Irsay of Dey's charges. The district court dismissed Dey's theory as "sheer speculation," but notwithstanding the company's denials, we think this aspect of Dey's retaliation claim survives summary judgment for the following reasons.

A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression. *Goldsmith,* 996 F.2d at 1163. Moreover, Dey need not prove by a preponderance of the evidence at the summary judgment stage that Irsay was aware of her sexual harassment complaints; she must only produce evidence that would support an inference that Irsay was so aware. *Cf. Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987). Although it weighs in Colt's favor that neither Ferguson nor Dey herself had relayed Dey's charges to Irsay, we must be primarily concerned with Chernoff, who would have a greater incentive than Ferguson to pass that information along. Chernoff of course denies that Dey ever complained to him, and as a result, he also denies telling Irsay of any such complaints. Irsay fully corroborates Chernoff's denial. We find it significant, however, that Chernoff denies even the fact that Dey had complained. It is

undisputed that Dey complained at least to Ferguson, who corroborates her story. We also must assume on summary judgment that Dey complained to Chernoff. A reasonable fact-finder could infer from that fact, and Chernoff's denial of it, that he also testified untruthfully about not telling Irsay. *Cf. Goldsmith*, 996 F.2d at 1163–64 & n. 12 (not error for district court to submit knowledge question to jury although both participants to a meeting denied they had discussed the plaintiff; one participant's testimony had been impeached by a prior statement and the timing of the decision supported an inference of knowledge).[12] The timing of the discharge decision, coming only four weeks after Dey's complaints and less than two weeks after her $60 per week raise, supports that inference.

■ Our conclusion also is influenced by Chernoff's participation in the decision to terminate Dey's employment, even if Irsay steadfastly maintains that the final decision was his alone. The record reveals that at the May 1985 meeting between Irsay, Chernoff, and Sullivan, Irsay solicited Chernoff's views on Dey's performance, and Chernoff agreed that it was unsatisfactory and that Dey should be replaced. Thus, even if Chernoff kept Dey's sexual harassment complaints to himself, those complaints may have affected Chernoff's unflattering assessment of her job performance. Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) (even where the plaintiff's supervisor may not have passed along

discriminatory animus to the ultimate decisionmaker, that animus tainted his assessment of the plaintiff's performance, on which the decisionmaker did rely); *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989) (relevant to jury's determination in age discrimination case that decisionmaker accepted input from supervisor who had discriminatory motive); *see also Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1165–66 (7th Cir.1994) (summary judgment improper where supervisor who allegedly made age-related remarks participated in ranking the performance of company employees and in the eventual decision to terminate the plaintiff's employment); *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir.1993) (reasonable jurors could conclude that a supervisor intent on purging the workforce of older employees lied to his superiors about the quality of the plaintiff's job skills); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316 (8th Cir.1994) (employers cannot escape responsibility for sex discrimination "when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of women."); *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1057–60 (8th Cir.1993) (evidence sufficient to support sex discrimination claim where superior's discriminatory animus was reflected in the information he provided to ultimate decisionmakers); *cf. Wilson v. Stroh Cos.*, 952 F.2d 942, 945–46 (6th Cir.1992) (Title VII plaintiff failed to show that lower level employee with discriminatory animus infected superiors' independent decision to terminate plaintiff's employment).

---

12. Our own cases explain that courts must be quite circumspect in evaluating the movant's factual averments "when evidence bearing on a particular matter lies within the exclusive possession of the party seeking summary judgment." *Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 452 n. 4 (7th Cir.1994); *see also Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir.1992). That is particularly so where the movant bears the burden of proof on the matter at issue. *Avery*, 18 F.3d at 452 n. 4; *Reserve Supply*, 971 F.2d at 42. Yet we also have observed that the moving party would be entitled to summary judgment "if the burden is on the nonmovant to establish the [requisite] state of mind and the nonmovant has failed to come

forward with even circumstantial evidence from which a [fact-finder] could reasonably infer the relevant state of mind." *Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir.1989). Here, although Dey bears the burden of establishing that her employer was aware of her protected expression when it discharged her, she may meet that burden through circumstantial evidence. *Goldsmith*, 996 F.2d at 1163. Because only Chernoff and Irsay were privy to their own discussions, we must consider their self-serving denials with some circumspection. In that light, we believe Dey has produced sufficient circumstantial evidence to support the inference that Irsay may have known of her complaints.

The district court did not consider this line of cases in concluding that Colt was entitled to summary judgment below. It therefore made no findings as to what Chernoff may have contributed to the decision to terminate Dey's employment. Although Irsay attests that he based the decision on his independent assessment of Dey's performance, which apparently was unaffected by any knowledge of Dey's complaints, he admits that he solicited Chernoff's opinion and that Chernoff agreed Dey should be fired. Thus, even apart from whether Irsay knew of the complaints, Chernoff's participation may have introduced a discriminatory animus into Irsay's decision. That inference would become stronger if Dey is able to show that her alleged performance deficiencies were fabricated, an aspect of her case that we address below. In the end, therefore, it would not be unreasonable to infer a causal link between Dey's complaints and her eventual discharge.

### 2. Pretext

■ In response to Dey's prima facie case, Colt articulates a legitimate, non-discriminatory reason for Dey's discharge—that Dey was uncooperative in the office, that a number of Colt employees had complained about her, and that her job performance on the whole was unsatisfactory. Dey counters that she was performing her duties adequately, but Colt is correct that such evidence generally is insufficient to raise a question of fact about an employer's honest assessment of inadequate performance. *See, e.g., Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848 (7th Cir.1992) ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability"); *Williams v. Williams Elec., Inc.,* 856 F.2d 920, 924 (7th Cir.1988) (employee's self-interested assessment of her own job abilities are insufficient to raise an issue of fact); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464–65 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Our cases also give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance. *See Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124–

25 (7th Cir.1994) (affidavit of former supervisor and testimony of co-worker that plaintiff's performance was satisfactory and that admitted mishaps were not entirely his fault insufficient to defeat summary judgment); *Williams,* 856 F.2d at 924 (former supervisor's general statements about the plaintiff's abilities did not establish that employer had not genuinely considered the plaintiff's performance in making its layoff decision); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Such evidence, we have explained, does not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases. *See Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156–57 (7th Cir. 1994); *Gustovich,* 972 F.2d at 848; *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992).

■ But Dey's evidence goes beyond general assertions of adequate job performance to directly address the specific performance deficiencies identified by Colt. Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies. *See Komel v. Jewel Cos.,* 874 F.2d 472, 474–75 (7th Cir.1989) ("an employee's denial of specific events which form the basis of the employer's evaluation may be sufficient to create a genuine issue of fact"); *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507 (5th Cir.1988) (same); *see also Shager,* 913 F.2d at 400–01 (plaintiff discharged for allegedly deficient performance survives summary judgment by showing that performance deficiencies were greatly exaggerated and that any deficiencies were offset by superior sales figures); *Dale,* 797 F.2d at 464 (employee must refute employer's specific explanations of inadequate job performance). A detailed refutation of events which underlie the employer's negative performance assessment demonstrates

that the employer may not have honestly relied on the identified deficiencies in making its decision. The plaintiff could thereby create a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination.

As the magistrate judge observed, Dey's evidence goes beyond general assertions of satisfactory job performance. Dey instead either denies that certain events ever took place or specifically addresses the complaints of uncooperative behavior made by Sullivan, McCoy, and others. She explains that what Sullivan and McCoy asked her to do on the occasions where they subsequently complained either contravened company policy or the specific instructions of Dey's superiors. Ferguson, moreover, corroborates Dey's version of those events and explains why Dey acted appropriately under the circumstances. Ferguson also indicates that neither Irsay nor Chernoff ever complained to him about any of the asserted deficiencies in Dey's performance and that he knew of no problems between Dey and her fellow workers. Dey adds that Irsay never complained to her about her work and that he instead occasionally expressed that he was pleased with her performance. *Cf. Juarez,* 957 F.2d at 321 (no factual issue as to pretext where employer fully informed employee of deficiencies in performance, enabling her to take corrective action). Indeed, Irsay gave Dey a $60 per week raise without the slightest mention of a performance deficiency less than two weeks prior to his decision to terminate her employment. This evidence, when considered in the light most favorable to Dey, and in conjunction with the telling sequence of events leading to her discharge, would permit a rational finder of fact to infer that Colt fabricated the reason for Dey's dismissal. That is all Dey must show to avoid summary judgment on her retaliatory discharge claim. *See Anderson,* 13 F.3d at 1124; *Shager,* 913 F.2d at 401 ("if the inference of improper motive *can* be drawn, there must be a trial" (emphasis in *Shager* )); *Holland,* 883 F.2d at 1316.

## C. Equal Pay Act

■ Dey's remaining claim is brought under the Equal Pay Act (the "EPA"), which prohibits, *inter alia,* sex-based wage discrimination:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d)(1). To establish a prima facie case under this section, Dey must show: " '(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions.' " *Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543, 548 (7th Cir.1991) (quoting *Fallon v. State of Illinois,* 882 F.2d 1206, 1208 (7th Cir.1989)). In assessing whether two jobs require equal skill, effort, and responsibility, we look to the duties actually performed by each employee, and not to his or her job description or title. *Soto,* 941 F.2d at 548; *Fallon,* 882 F.2d at 1208. If two employees have a common core of tasks, the second element of the prima facie case is satisfied unless the employer can show that the higher-paid employee was assigned additional tasks that made his job "substantially different." *Fallon,* 882 F.2d at 1209; *Soto,* 941 F.2d at 548.

■ Dey's claim is premised on the difference between her ending salary and the salaries paid to her two male successors. At the time of her termination, Dey was making an annual salary of approximately $27,500. Her immediate successor, Gagnon, was hired at a starting salary of $50,000, and Maloney, who replaced Gagnon after six months, earned $32,400 initially, and $34,020 after six months. This differential between the plaintiff's salary and that of her successors is sufficient to support an action under the EPA. *See, e.g., Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1260 (7th Cir.

1985). Dey has conceded on appeal, however, that Gagnon's responsibilities were substantially different from her own, so that his higher salary was justified. She focuses here only on Maloney, and we agree with the district court that there are factual questions as to whether the responsibilities of Maloney and Dey were substantially different. We therefore assume that Dey could establish a prima facie case and proceed to Colt's defenses.

Once the plaintiff makes out a prima facie case, the employer bears the burden of showing that the pay disparity is due to: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); see Soto, 941 F.2d at 548; Fallon, 882 F.2d at 1211. Colt bears the burden of persuasion on these statutory affirmative defenses. Fallon, 882 F.2d at 1211. The district court concluded that Colt had satisfied its burden by showing that Maloney had more advanced business degrees—a four-year college degree and an MBA as opposed to Dey's two-year associate's degree—and that it initially had offered less money but that Maloney had negotiated a salary comparable to what he had earned from Allnet. The court found that both were based on factors other than sex and that they therefore justified Maloney's higher salary.

We explained in Fallon that the EPA's fourth affirmative defense "is a broad 'catch-all' exception [that] embraces an almost limitless number of factors, so long as they do not involve sex." 882 F.2d at 1211; see also Patkus, 769 F.2d at 1261. The factor need not be "related to the requirements of the particular position in question," nor must it even be business-related. Fallon, 882 F.2d at 1211; Covington v. Southern Illinois Univ., 816 F.2d 317, 321–22 (7th Cir.), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 101 (1987). Because it is not our province to second-guess the employer's business judgment, we ask only whether the factor is bona fide, whether it has been discriminatorily applied, and in some circumstances, whether it may have a discriminatory effect. Fallon, 882 F.2d at 1211.[13]

We agree with the district court that Dey has been unable to dispute Colt's assertion that the pay disparity was based on a factor other than sex. Although Maloney was not a CPA, he did have a masters degree in business administration, which would justify Colt's paying him a higher salary to perform a controller's duties. See, e.g., Soto, 941 F.2d at 548 n. 7; Covington, 816 F.2d at 323–24 & n. 9 (male professor's education and teaching experience may be considered as factors other than sex). Although Dey had no doubt garnered invaluable experience during her tenure with Colt, we may not second-guess the company's decision to pay more for an advanced business degree where there is no evidence that it paid women with similar degrees a lesser amount or that Maloney's degree was unrelated to the tasks assigned him.

■ It also is undisputed that Colt initially offered Maloney approximately $30,000, but that he negotiated an annual salary closer to what he had been earning at Allnet. It is not surprising that Maloney would be unwilling to become Colt's controller unless he was compensated at or near his previous rate. Such evidence must be considered with some caution, of course, as undue reliance on salary history to explain an existing wage disparity may serve to perpetuate differentials that ultimately may be linked to sex. See Riordan v. Kempiners, 831 F.2d 690, 699–700 (7th Cir.1987); Covington, 816 F.2d at 322. Yet when we consider Colt's initial offer and the ensuing negotiations in conjunction with Maloney's superior educational background and the fact that Colt hired Maloney almost a full year after Dey's last pay raise, we are convinced that Maloney's higher salary is unrelated to his sex. Colt was therefore entitled to summary judgment on the EPA claim.

■ One further issue requires our attention. Dey requests that we invoke Circuit Rule 36 on remand, which would require that

---

**13.** We intimated in Fallon that even a factor having a discriminatory effect may not be invalid. 882 F.2d at 1211 n. 4. We need not decide that issue today, as Dey has not asserted that the factors relied on by the district court would have a discriminatory effect.

her case be assigned to a different district judge for trial. Dey reasons that because her Title VII claims, which arose prior to the 1991 amendments to Title VII, must be tried to the court rather than to a jury (*see Landgraf v. USI Film Prods.*, — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Mojica v. Gannett Co.*, 7 F.3d 552, 558–59 (7th Cir. 1993) (en banc), *cert. denied*, — U.S. —, 114 S.Ct. 1643, 128 L.Ed.2d 363 (1994)), they should not be tried to a judge who has already determined that she is entitled to no relief. Circuit Rule 36 automatically applies on remand if we reverse a judgment entered after a trial and remand for a new trial. Because this case comes to us on summary judgment, the rule would not automatically apply, but we have discretion to invoke it in an appropriate case. We agree with Dey that application of the rule is appropriate here, notwithstanding our regard for the hardworking and conscientious district judge. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 620 (7th Cir.1993). Nor should our invocation of the rule be construed to intimate any view on the appropriate outcome of the impending trial. As we have explained, the success or failure of Dey's claims depends in large measure upon credibility assessments that can only be made by the district court below.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment on Dey's sexual harassment and retaliatory discharge claims. The evidence supporting her claims is sufficient to require a trial, and we remand for that purpose. Because Dey is unable to raise a material dispute as to Colt's stated justification for the salary disparities, however, we affirm the grant of summary judgment on Dey's claim under the Equal Pay Act. Circuit Rule 36 shall apply on remand. Dey shall recover her costs on this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.