**Paul WENNER, Plaintiff,**

v.

**C.G. BRETTING MFG. CO., INC., Defendant.**

**No. 95–C–0006–C.**

United States District Court, W.D. Wisconsin.

Sept. 6, 1995.

Alan C. Olson, Law Office of Alan C. Olson, New Berlin, WI, for Paul Wenner.

John H. Zawadsky, Attorney at Law, Madison, WI, for C.G. Bretting Mfg., Co., Inc.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary and injunctive relief brought pursuant to 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3 and 28 U.S.C. § 1367. In his complaint, plaintiff raised a federal claim of retaliation for opposing sexual harassment in the workplace and supplemental state law claims for breach of contract and detrimental reliance. In his brief, he argued a claim of sexual harassment. (For completeness, all of the claims are addressed in this opinion.)

Presently before the court is defendant's motion for summary judgment. I conclude that defendant is entitled to summary judgment on plaintiff's claim of sexual harassment because plaintiff has not met his burden of showing that the behavior complained of rose to the level of actionable sexual harassment. Defendant is entitled to summary judgment on plaintiff's claim of retaliation under Title VII because plaintiff has not adduced evidence that could lead a reasonable jury to find that the person who terminated plaintiff was aware of plaintiff's protected conduct. Finally, since post-termination retaliatory conduct is not actionable, defendant is entitled to summary judgment on plaintiff's breach of contract and detrimental reliance claims because they do not form part of the same case or controversy as plaintiff's federal retaliation claim.

■■■ To prevail on a motion for summary judgment, the moving party must show that even when all inferences are drawn in the light most favorable to the non-moving party, there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *McGann v. Northeast Illinois Regional Commuter Railroad Corp.*, 8 F.3d 1174, 1178 (7th Cir.1993). "Defeating summary judgment requires more than just a swearing match," *Matter of Wade*, 969 F.2d 241, 245 (7th Cir.1992); the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, summary judgment may be awarded against the non-moving party only if the court concludes that a reasonable jury could not find for that party. *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir.1992) (citing *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332, 335 (7th Cir.1991)).

For the purpose of deciding this motion, I conclude from the parties' proposed findings of fact that there is no genuine dispute over the following material facts.

## UNDISPUTED FACTS

On or about November 15, 1992, plaintiff Paul Wenner was hired by defendant C.G. Bretting Mfg. Co., Inc. to manage the company's electrical engineering department. Defendant is a Wisconsin corporation doing business out of its facilities in Ashland, Wisconsin, and is engaged primarily in the manufacture of converting equipment for the paper tissue industry. In October of 1993, Tom Jehn was hired to be defendant's manager of engineering. Plaintiff reported to Jehn. Tad Bretting was president of the company and also monitored plaintiff's job performance. David H. Bretting, vice-president of the company, oversaw all personnel matters, including making and implementing discipline and discharge decisions.

During his first three months with defendant, Jehn received complaints about plaintiff from a number of company employees. These complaints suggested that plaintiff was aloof and arrogant, talked down to individuals, did not cooperate with other employees, refused to take responsibility for his actions and did not communicate effectively with his co-workers. Also during his first few months, Jehn learned of customer complaints regarding plaintiff's conduct, which included unresponsiveness to customers and resistance to working with customers on their orders.

In early January 1994, Jehn and David Bretting met to discuss plaintiff's job performance and agreed that the situation was serious enough that Jehn would "coach" plaintiff regarding his relationships with other employees and customers. On February 10, 1994, David Bretting met with plaintiff, expressed the concerns he had with plaintiff's job performance and told plaintiff he was being given a final chance.

Not all employees were dissatisfied with plaintiff's performance. Jeff Ginzl, a senior electrical engineer and relatively new employee, believed that plaintiff was a good manager who was honest and neither mistreated his co-workers nor talked in an arrogant manner toward his employees. Similarly, Tad Bretting, who worked with plaintiff on a daily basis, never found him to be either arrogant or aloof and never saw any reason to discipline him. Plaintiff never received any written warnings regarding his performance. Instead, he received several bonuses from Tad Bretting and a salary increase during his tenure at the company. Finally, Jehn indicated that some conflicts between plaintiff and other employees were the result of confusion as to what supervisory responsibilities plaintiff would have in relation to Jehn.

On May 10, 1994, four representatives of Kayserberg Corporation, a paper company located in France, came to Bretting to inspect an inter-folder machine Kayserberg had ordered. Among them were Gerald Langer, project manager for Kayserberg, and Roger Menetré, Kayserberg's chief electrical engineer. The Kayserberg representatives were scheduled to visit the company through May 14, 1994.

On the morning of May 10, Kayserberg representatives met with defendant's representatives to discuss the inter-folder machine. Plaintiff met Langer for the first time at this meeting. During the meeting, Langer looked adoringly at plaintiff and looked up and down plaintiff's body. Plaintiff found this conduct objectionable but did not respond. Other employees and Kayserberg representatives were present while this conduct was taking place. That evening, representatives of both companies met for dinner.

Plaintiff sat directly across from Langer. Toward the end of dinner, Langer began to rub his feet and leg against plaintiff's leg under the dinner table while smiling at plaintiff and looking at him adoringly. Plaintiff did not excuse himself from the table because he thought it would be rude to leave. After dinner, Langer stated to plaintiff, "Mr. Wenner, you look very handsome this evening," and told him that his eyes looked very nice with his tie. Plaintiff said "Thank you."

The next morning, May 11, Langer approached plaintiff while he was sitting in the assembly area of the plant in the presence of other employees. Langer said, "Good morning, Mr. Wenner, you look very handsome today." While making this statement, he leaned over plaintiff, rubbed his shoulders and placed his cheek close to plaintiff's. Plaintiff responded, "Thank you," as he tried to get out of his chair. Langer commented again on how well plaintiff's eyes matched his tie. Later that day, plaintiff and Langer attended a meeting with other Bretting and Kayserberg representatives, during which Langer stared at plaintiff and smiled at him.

On the morning of May 12 in the assembly area of defendant's facilities, Langer told plaintiff, "I'm very happy to see you again, Mr. Wenner. You look very nice today." Langer then took plaintiff's upper arm and steered him to the area of the machine where Kayserberg representatives had questions. At all times, at least one Kayserberg representative and other employees of defendant were present in the assembly area. Also between May 10 and 12, Langer winked at plaintiff and asked him, "What nice things do you like?" and "What kinds of things do you think are pretty?"

On the afternoon of May 12, in the assembly area of defendant's plant and in the presence of other employees, plaintiff approached Langer and said to him, "Mr. Langer, I'd like to tell you that I feel uncomfortable with your advances. I wish that you would discontinue or stop." Langer made no verbal response to plaintiff's comments, although he looked upset. Plaintiff then walked away.

Also on May 12, the manager of the napkins division, Bert Saari, advised David Bretting that he had returned from visiting one of defendant's customers in Germany named Apura, Inc., and that Apura's management had instructed Saari that it would not work with plaintiff again. In the evening of May 12, plaintiff and his wife hosted a dinner party at their home which was attended by Terry Bretting (the wife of David Bretting's brother Paul Bretting), Jehn and Jeff Ginzl. During dinner and in the presence of all the guests, plaintiff told Jehn about the events that had occurred at dinner with the Kayserberg representatives on May 10. In addition, plaintiff told Jehn that Langer came too close to him when he talked and had terrible breath, that he put his hand on plaintiff's shoulder while plaintiff was working at the computer and that plaintiff wanted Langer to stay away. Plaintiff also told Jehn that he felt Langer's conduct was offensive and embarrassing and that he had told him to stop. Some of the guests laughed at plaintiff's description of Langer's conduct.

After dinner, plaintiff, Jehn and Ginzl went into plaintiff's living room. Plaintiff told Jehn that Langer's conduct was "really starting to bother [him]." Jehn told plaintiff not to worry because Langer would be leaving at the end of the week. Although Jehn concluded that plaintiff did not enjoy having Langer close to him, he told plaintiff that Langer would soon be gone and to "let it pass." It was Jehn's understanding that plaintiff had taken steps to insure that Langer did not get too close to him in the future and that he would be able to "just handle it." Jehn was aware that plaintiff knew that Langer would be leaving at some point between May 13 and May 15, 1994.

After learning of Langer's actions from plaintiff, Jehn took no further action in response to what he had heard. Jehn was out of the office until May 18, 1994. At no point did Jehn advise David Bretting either that plaintiff believed he was being subjected to inappropriate or harassing conduct or that plaintiff had complained about the conduct. Plaintiff avoided Langer on May 13 and 14, 1994, and experienced no further objectionable conduct from Langer after his conversation with Jehn on May 12. However, plaintiff felt uncomfortable about going to work while Langer was visiting.

In the morning of May 14, 1994, Dennis Couturier, a manager at Bretting, told David Bretting that he had received complaints about plaintiff from Kayserberg representatives. David Bretting then met with Couturier and Kayserberg representatives Langer and Roger Menetré. During this meeting, Menetré complained about plaintiff and told David Bretting that Kayserberg did not want to deal with plaintiff again. Following the meeting with Langer and Menetré on May 14, David Bretting decided to terminate plaintiff.

On May 18, 1994, David Bretting and Jehn met to discuss plaintiff. David Bretting told Jehn that he had made the decision to terminate plaintiff. At the time, David Bretting knew nothing of the performance bonuses plaintiff had been paid.

In the afternoon of May 18, 1994, Jehn and David Bretting met with plaintiff in David Bretting's office and told plaintiff he was terminated. During the meeting, David Bretting mentioned that Langer had complained that plaintiff's behavior "was absolutely unacceptable and rude." David Bretting also told plaintiff that Langer had said that he "would no longer do business with Bretting Manufacturing if [plaintiff] was employed there." Additionally, David Bretting referred to the complaints he had received from Apura, Inc.

When plaintiff was hired by defendant, he sold his Green Bay home and moved his family to Ashland, Wisconsin, where they purchased a lot and constructed a new home in May of 1993. The home in Ashland was more expensive to build and maintain than plaintiff's former home.

At some point, Tad Bretting promised that if plaintiff left his job, Tad Bretting would purchase plaintiff's home through the company at its appraised value. After plaintiff was terminated, he met with Tad Bretting in June of 1994 and said to him, "We had an agreement prior and during the building of my house that you would purchase this

home." Tad Bretting did not purchase the home.

## OPINION

### A. Sexual Harassment

■ Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment in the workplace constitutes sex discrimination and violates Title VII. Title VII claims can arise from two different kinds of sexual harassment: "quid pro quo," which involves the demand of sexual favors in exchange for the grant or denial of job benefits; and harassment arising from a hostile work environment, which involves conduct that interferes unreasonably with an individual's work performance and creates an intimidating, hostile, or offensive work environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). Plaintiff contends that he was subjected to same sex harassment under both quid pro quo and hostile environment theories. The initial question is whether same sex harassment is actionable under Title VII.

As a natural consequence of the historical imbalance of power between men and women in the workplace, most sexual harassment claims have involved the harassment of women by men. *Marrero–Rivera v. Department of Justice*, 800 F.Supp. 1024, 1027 (D.P.R. 1992), *aff'd*, 36 F.3d 1089 (1st Cir.1994). However, the plain language of Title VII does not confine its protections only to employees of the opposite sex. *Id.* at 1027. *See also Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir.1995) (noting in dicta that Title VII does not "exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women ... [is] actionable in appropriate cases"). It is unnecessary to decide in this case whether same sex harassment is actionable under Title VII. For the purpose of this opinion only, I will assume without deciding that the alleged harasser's behavior is actionable sexual harassment under Title VII.

### 1. *Quid pro quo sexual harassment*

■ Quid pro quo sexual harassment occurs when "submission to [sexual] conduct is made either explicitly or implicitly a term or condition of an individual's employment" or when "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual...." 29 C.F.R. § 1604.11(a)(1)–(2). Quid pro quo harassment is not present in this case. The alleged harasser, Langer, was a visitor to defendant's premises. As such, he was not in a position either to make submission to sexual conduct a term or condition of plaintiff's employment or to make employment decisions affecting the plaintiff. There may be situations in which a plaintiff could show that a customer's demands had this effect, as for example if the employer made clear to its employee that submission to the customer's advances was a condition of employment. However, plaintiff has adduced no evidence suggesting that defendant intended that his continued employment or his chances of advancement be conditioned upon his submission to the unwelcome sexual advances of Langer. Therefore, defendant is entitled to judgment as a matter of law on this claim.

### 2. *Hostile environment sexual harassment*

■ Sexual harassment will constitute a hostile work environment only if it has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2404–05 (quoting 29 C.F.R. § 1604.11(a)(3)). In determining whether a plaintiff's work environment is hostile within the meaning of Title VII, a court considers several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 371, 126

L.Ed.2d 295 (1993). Although the effect on the employee's psychological well-being is relevant to determining whether the plaintiff found the environment abusive, "no single factor is required." *Id.* at —, 114 S.Ct. at 371.

■ The undisputed facts do not indicate that plaintiff was subjected to a hostile work environment as proscribed by Title VII. First, plaintiff has not put forth evidence to show that the harassment was severe and pervasive enough to alter the conditions of his employment. *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405–06. Langer's objectionable conduct included rubbing plaintiff's leg under the table, smiling, winking, and "looking adoringly" at plaintiff, telling plaintiff that he looked handsome and that his eyes went well with his tie, taking plaintiff's arm and walking with him a few feet, rubbing plaintiff's shoulders while putting his cheek next to plaintiff's, and asking plaintiff "What nice things do you like?" and "What kinds of things do you think are pretty?" Although the context in which these incidents arose suggests that they can be construed as sexual in nature, they were neither severe nor pervasive enough to constitute a hostile environment. *See, e.g., Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 534–35 (7th Cir.1993) (no actionable sexual harassment where supervisor touched and rubbed plaintiff's leg, pulled plaintiff into a doorway and kissed her, and lurched at her as if to grab her because plaintiff failed to adduce evidence that alleged harasser's conduct was frequent or severe, interfered with her work or otherwise created an abusive environment); *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993) (no actionable harassment where plaintiff's supervisor asked plaintiff out on dates, called her a "dumb blond," placed his hand on her shoulder several times, attempted to kiss her, and placed "I love you" signs in her work area because incidents were not severe and were relatively isolated).

Second, "[r]elatively isolated" instances of non-severe misconduct will not support a hostile environment claim, *Weiss,* 990 F.2d at 337. The fact that Langer's acts occurred over a two-day period and did not continue after plaintiff told Langer to stop suggests that plaintiff was not subjected to hostile environment sexual harassment. *See Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990) (repeated acts of sexual misconduct during a two-week period did not give rise to hostile environment claim where aggressor's behavior ceased after plaintiff reprimanded him).

Third, plaintiff offered no evidence to suggest that Langer's conduct interfered unreasonably with his work performance. In considering whether the conduct actually altered the conditions of the victim's employment, *Harris* requires the court to evaluate the relevant factors from both a subjective and objective viewpoint, asking whether the conduct is severe or pervasive enough that a reasonable person would find it hostile or abusive, and considering whether the victim subjectively perceived the environment to be abusive. *Harris,* 510 U.S. at —, 114 S.Ct. at 370. Although plaintiff alleges that the conduct made him uncomfortable about going to work while Langer was visiting, he failed to adduce any evidence to suggest that the behavior was such that "a reasonable person would find [it to be] hostile or abusive . . . ." *id;* or that he was sexually harassed to a degree that could be said to affect adversely the conditions under which he worked. *Carr v. Allison Gas Turbine Div., General Motors Corp.,* 32 F.3d 1007, 1008 (7th Cir.1994). Given this lack of evidence and the facts that the conduct was of short duration, the incidents were limited in number, the majority of incidents were neither physically threatening nor severe and Langer discontinued his conduct after plaintiff told him to stop, I conclude that plaintiff has failed to show the existence of evidence from which a jury could find he had been subjected to hostile environment sexual harassment. Consequently, I conclude that defendant is entitled to summary judgment on plaintiff's claim that he was subjected to hostile environment sexual harassment.

#### B. *Retaliation Under Title VII*

■ Generally, employers are free to discharge employees at will with certain established exceptions. Among those exceptions is a prohibition on discharging employees or

otherwise retaliating against them for exercising their rights under Title VII to speak out against sexual harassment or prohibited discrimination. 42 U.S.C. § 2000e–3. It is also a protected activity to challenge conduct that an employee reasonably believes to be in violation of Title VII, even if an actual violation of Title VII is not ultimately proved. *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir.1989) (citing *Jennings v. Tinley Park Community Consol. School Dist. No. 146*, 796 F.2d 962, 967 (7th Cir.1986)).

 In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that he engaged in statutorily protected expression; he suffered an adverse employment action; and there is a causal link between the protected expression and the adverse action. *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994); *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1457–58 (7th Cir. 1994); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (quoting *Collins v. Illinois*, 830 F.2d 692, 702 (7th Cir.1987)). If plaintiff makes this showing, the burden of producing a legitimate nondiscriminatory reason for the adverse action shifts to defendant. *Alexander*, 40 F.3d at 195; *Dey*, 28 F.3d at 1457. Plaintiff bears the ultimate burden of persuading the fact finder that defendant's reasons are pretextual and that the actual reason for its action was retaliatory. *Alexander*, 40 F.3d at 195; *Dey*, 28 F.3d at 1457.

### 1. *Plaintiff's prima facie case*

 With respect to the first element of the prima facie case for retaliation, plaintiff identifies as his protected expression the comments he made to Langer on May 12 and to Jehn during and after the dinner party on May 14. Although plaintiff must reasonably believe that the challenged conduct violates Title VII, he need not make a formal complaint of perceived sexual harassment. *See, e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 n. 11 (11th Cir.1993) (statements made in course of "private conversation" are actionable); *Rollins v. State of Florida Department of Law Enforcement*, 868 F.2d 397,

400 (11th Cir.1989) (informally voicing complaint of discrimination is protected expression under Title VII). However, a plaintiff cannot make a vague charge of discrimination. *See Booker v. Brown and Williamson Tobacco Company*, 879 F.2d 1304, 1313 (6th Cir.1989). I have found it undisputed that plaintiff perceived Langer's behavior to be offensive and embarrassing and that plaintiff conveyed this information to Jehn when he told him that Langer's behavior "is really starting to bother me" and that he wanted Langer to "stay away." Defendant argues that plaintiff's comments were not made in such a way as to indicate to Jehn that plaintiff was making a discrimination complaint and even if they were, the comments were not directed to any employment practice of defendant. I need not decide whether plaintiff's conversation with Jehn amounted to protected expression. I will assume that it did for the purpose of this opinion only.

Plaintiff satisfies the second element of the prima facie case for retaliation because he suffered an adverse employment action. However, with respect to the third element, it is undisputed that David Bretting fired plaintiff and that neither plaintiff nor Jehn told David Bretting about plaintiff's expression of contempt for Langer's conduct. Generally, courts have not found a causal link between protected activity and an adverse employment action if the decision maker does not know of the protected activity. *See, e.g., Goldsmith*, 996 F.2d at 1163 (plaintiff offered sufficient circumstantial evidence that decision maker was aware that plaintiff intended to file a discrimination suit); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993) (summary judgment proper where plaintiff failed to provide any evidence that decision maker knew previous EEO complaints had been filed); *Jennings*, 796 F.2d at 967 (where plaintiff had given decision maker a copy of a salary study suggesting wage discrimination with her name on it, decision maker had reason to believe plaintiff was involved in drafting document).

Plaintiff cites *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987) for the proposition that a causal link between his protected conduct and the ad-

verse employment action may be established when an alleged harasser substantially affects the decision to terminate the plaintiff. Plaintiff contends that his rejection of Langer's advances may have prompted Langer's negative comments and affected David Bretting's decision to discharge him. However, in *Sparks*, the alleged harasser was also the plaintiff's supervisor. It is proper to impose liability on employers for the discriminatory acts of their supervisory employees, such as making biased recommendations, but there is no basis in the law for making a company liable for the discriminatory acts of non-employees when the company does not know that the third party's information is tainted by a discriminatory bias. I conclude that plaintiff has not met his burden of showing a genuine issue for trial on his claim that David Bretting retaliated against him for his alleged complaints of sexual harassment.

### 2. *Failure to purchase plaintiff's home*

 Plaintiff frames this claim as one for retaliatory breach of contract, alleging that Tad Bretting agreed to purchase plaintiff's house through the company at its appraised value in the event that plaintiff's employment with defendant was discontinued. Plaintiff asserts that he relied detrimentally on Tad Bretting's promise to purchase his home when he accepted the offer and built a home that was more expensive to build and maintain than his former home and that Tad Bretting's alleged breach of contract was taken in retaliation for plaintiff's opposition to the perceived sexual harassment by Langer.

The Court of Appeals for the Seventh Circuit does not recognize claims of retaliation brought pursuant to 42 U.S.C. § 2000e–3(a) that are based on actions taken after the termination of the employment relationship. *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 709 (7th Cir.1995) (former employee could not recover for alleged retaliation that occurred after termination of her employment); *Reed v. Shepard*, 939 F.2d 484, 493 (7th Cir.1991) (events subsequent to and unrelated to employment do not evidence actionable retaliation); *Hirschinger v. Allstate Ins. Co.*, 884 F.Supp. 317, 319 (S.D.Ind.1994) (discrimination or retaliatory activities that

occur after plaintiff no longer works for defendant are not actionable); *Pelech v. Klaff–Joss, LP*, 828 F.Supp. 525, 533 (N.D.Ill.1993) (Title VII does not provide relief for post-termination retaliation). It is undisputed that Tad Bretting's refusal to purchase plaintiff's home occurred after plaintiff was terminated. However, plaintiff contends that under the terms of the alleged contract, discontinuation of employment was a condition precedent to Tad Bretting's purchase of plaintiff's house. Thus, he argues, it follows that any breach of the alleged contract can occur only after he left his employment.

Even if plaintiff had a viable cause of action for retaliation based on post-termination breach of contract, it is still necessary for him to establish that the alleged breach was taken in retaliation for his complaints of sexual harassment. As discussed above in the context of plaintiff's retaliation claim, courts have not generally found a casual link between protected activity and an adverse employment action if the employer does not know of the protected activity. *See Goldsmith*, 996 F.2d at 1163; *Williams*, 983 F.2d at 181; *Jennings*, 796 F.2d at 967. Plaintiff has not adduced any evidence suggesting that Tad Bretting had knowledge that plaintiff had complained of what he perceived to be sexual harassment. Therefore, I conclude that plaintiff has not met his burden of showing a genuine issue for trial on his claim that Tad Bretting retaliated against him for his complaints of sexual harassment.

### C. *Supplemental Jurisdiction*

 When a court considers whether to exercise supplemental jurisdiction over pendent state law claims such as plaintiff's breach of contract and promissory estoppel claims, it determines whether the claims form part of the same case or controversy as the federal law claims, 28 U.S.C. § 1367(a), and "weigh[s] the factors of judicial economy, convenience, fairness and comity...." *Wright v. Associated Insurance Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994).

 When federal claims are dismissed before trial, as is the case here, the decision to exercise supplemental jurisdiction over state law claims is a matter of discretion. *United Mine Workers v. Gibbs*, 383 U.S. 715,

726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, in all but the rarest instance, the court is to decline to do so. *Wentzka v. Gellman,* 991 F.2d 423, 425 (7th Cir.1993). I decline to exercise supplemental jurisdiction in this case and I will dismiss plaintiff's state law claims. He may pursue them in state court if he wishes.

### ORDER

IT IS ORDERED that the motion for summary judgment of defendant C.G. Bretting Mfg. Co., Inc. is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.