73 F.3d 365
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Richard WITTWER, Plaintiff-Appellant,
v.
MACLEAN HUNTER PUBLISHING COMPANY, Defendant-Appellee.
 No. 95-1699.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 26, 1995.
Decided Dec. 27, 1995.
 
 Before POSNER, Chief Judge, and BAUER and COFFEY, Circuit Judges.
 
 ORDER
 
 1
 Richard Wittwer was an employee of Maclean Hunter Publishing Co ("Maclean") from March 1980 until August 1992, when his employment was terminated. The plaintiff filed suit against Maclean claiming that he was discharged in violation of the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. Sec. 621, et seq. Maclean moved, and the district court granted, summary judgment. Wittwer appeals. We AFFIRM.
 
 I. FACTUAL BACKGROUND
 
 2
 Wittwer was hired by Maclean in March 1980, as a Marketing/Sales Manager. His duties included selling advertising space in the publications of Maclean's Mining and Construction Group ("the Group"), and his sales territory encompassed the midwestern United States. Wittwer's primary responsibility was to sell advertising space in Concrete Products ("Concrete "), which accounted for 90% of his business. He also had limited sales responsibilities for Coal Magazine, Engineering and Mining Journal, Rock Products, and International Construction ("Construction ").
 
 
 3
 In the early 1990's, Maclean noticed that advertising revenue from the Group was declining. In order to combat the decrease, Maclean hired Robert Dimond as the Publisher for the Mining and Construction Group in October 1990, and in May 1992, Dimond hired John Bold as an Associate Publisher and National Sales Manager. Together, the two men evaluated the Group's sales structure and tried to determine how to increase revenue. They concluded that an overall reorganization of the sales division was in order, and decided that representatives should begin employing a "consultive" approach to selling advertisements.[1] They were responsible for the decisions regarding sales personnel, including transfer, hiring and termination.
 
 
 4
 In August of 1992, in an attempt to improve the sales department's performance, Bold and Dimond reorganized and consolidated the sales responsibilities of their personnel. The sales representatives were responsible for selling advertisements in fewer publications. The restructuring also resulted in the creation of one sales position for midwest advertising in Concrete and Construction. Because Wittwer had the primary responsibility for Concrete before the reorganization, Bold and Dimond examined his performance in order to determine if he should assume the new consolidated position for Concrete and Construction.
 
 
 5
 Bold and Dimond inspected Wittwer's sales records for the previous three years and noted that the plaintiff sold more pages and advertising dollars in Concrete than any other sales representative assigned to the magazine. In spite of this fact, his aggregate sales were declining at a more accelerated rate than any one of the other sales persons in the Group. In 1990, he sold 42% of the ad space in Concrete, 38% in 1991, and 29% in 1992. Additionally, after having had an opportunity to observe Wittwer's sales calls, Dimond and Bold were not impressed with the plaintiff's advertising space sales technique for it was less than "consultive" in style than they desired. See, Note 1, supra. Referring to Wittwer's sales promotion style, Dimond stated:
 
 
 6
 I was not impressed at all with his style in dealing with [clients]. He rambled a lot. His selling approach I did not think was effective. He violated a basic principle in sales, at least in my view, that you try to get the customer to do as much talking as possible, draw out their wants and needs and so forth. He tended to dominate a conversation and it wasn't always ... a very effective selling kind of conversation.
 
 
 7
 Bold found that Wittwer was "verbose, not very focused, it was difficult to understand the point he was making at times.... I don't think he did a good job of communicating his sales message."
 
 
 8
 As a result of their evaluation of the plaintiff, Dimond and Bold determined that Wittwer was not the right person to assume sole responsibility for selling ad space in the midwest region for Construction and Concrete. Dimond and Bold also felt that the advertising base for Construction, a relatively new publication, acquired by Maclean in 1990, had great growth potential in the midwest which Wittwer to date, had been and probably would be unable to exploit. Although Wittwer had an existing list of contacts in the construction equipment market, he was lacking potential new advertisers for the magazine, because of his want of experience in or knowledge of the construction industry.
 
 
 9
 Bold and Dimond decided to replace Wittwer with Renee Shane, who was 33 years of age at the time she began work at Maclean in August 1992. Shane, who had a B.S. in journalism and marketing, was assigned the exclusive sales responsibility in the midwest for Concrete and Construction. Shane's former job was as a Marketing Communications Manager for Allied Steel & Tractor Products, Inc., a manufacturer of heavy construction equipment, and her duties included directing both corporate advertising and public relations. During her tenure with Allied, Shane met Dimond at a number of trade shows and she had expressed her interest in a career in selling advertising to Dimond.
 
 
 10
 In her managerial capacity, a position she held for six years, she was responsible for a $300,000-$350,000 advertising budget, and had purchased ad space in over a dozen construction publications, including Construction. Additionally, she served on the marketing committee of the Construction Industry Manufacturers' Association ("CIMA"), the principal trade organization for the construction equipment industry, and had extensive contacts throughout the industry. Thus, although she had no experience selling advertising prior to commencing her employment with Maclean, Bold and Dimond believed that she would be a more effective midwest sales representative than Wittwer because of her contacts in the construction industry and her experience in purchasing advertising space in numerous construction publications.
 
 
 11
 Bold informed Wittwer of the reorganization of sales assignments necessitating his termination on August 27, 1992, and told Wittwer that because of the restructuring that was about to take place, neither he nor Dimond felt that Wittwer was the most qualified person for the new position. Thereafter, Dimond followed up the conversation with a memo to the plaintiff, dated August 27, which stated: "This will confirm the fact that we plan some major restructuring of our sales efforts in the U.S. and is the reason for your termination. The restructuring will involve several of our publications and territories and affect a number of our current staff."
 
 
 12
 At the time Maclean hired Wittwer, he was 63 years of age, although he told Maclean that he was 46.[2] He was 75 at the time his employment was terminated, but Maclean thought he was 63. Maclean's other sales representatives in the midwest territory, Ray Burchett and Frank Gray, each were in their sixties when Wittwer was fired, and to the best of Maclean's knowledge, both men were older than Wittwer. Burchett and Gray retained their positions after the reorganization. The plaintiff alleges that his age was a constant source of office conversation and that Burchett, in particular, frequently made comments concerning Wittwer's age. During his deposition, Gray stated that Wittwer's age was "an office joke" in the sense that his co-workers were always asking "just how old is this guy?" When Gray was asked if he ever heard Bold or Dimond make such jokes, he replied "No."
 
 
 13
 The plaintiff filed a charge of age and sex discrimination with the Illinois Department of Human Rights ("IDHR"), and thereafter filed an age discrimination suit in district court. 29 U.S.C. Sec. 621, et seq. Maclean filed a motion for summary judgment, arguing that there were no material facts in the record which would support Wittwer's claim that he was fired because of age. The district court granted the motion. Wittwer appeals.
 
 II. DISCUSSION
 
 14
 Wittwer argues that the district court erred when it granted Maclean's motion for summary judgment in that a reasonable jury could have found that Maclean's reasons for firing him were pretextual because: (1) the sales department of the Group was not truly reorganized, other than that he was fired and Shane was hired; (2) his allegedly poor job performance was never cited as a reason for his termination until Maclean moved for summary judgment; (3) the fact that Maclean gave inconsistent reasons for his dismissal (i.e., informing him and the IDHR that he was replaced because of a reorganization of the sales department, but arguing before the district court that he was discharged because his performance was sub-standard) establishes that the company did not believe its proffered reasons; (4) he was replaced by a much younger person who was not as qualified for the job as he was; and (5) there is additional evidence of age discrimination on the part of Maclean in that Wittwer's age was the office joke and the only other Maclean employee over the age of 70 was fired when she refused to accept a new job at reduced pay of one-half her current salary
 
 
 15
 "We review the district court's grant of summary judgment de novo, drawing all reasonable inferences from the record in the light most favorable to the non-moving party." Johnson v. Runyon, 47 F.3d 911, 917 (7th Cir.1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A motion for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "If no reasonable jury could find for the party opposing the motion, it must be granted." Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995) (citing Anderson, 477 U.S. at 248). Mere "[c]onclusory allegations by the party opposing the motion cannot defeat the motion." Id. The non-moving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
 
 
 16
 To succeed in an age discrimination case, a plaintiff must establish "that he would not have been discharged 'but for' his employer's motive to discriminate against him because of his age." Karazanos v. Navistar Int'l. Transp. Corp., 948 F.2d 332, 335 (7th Cir.1991) (quotation omitted). In order to prove his claim, an ADEA plaintiff may utilize the burden shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as it has been adapted to age discrimination claims. Id. (citations omitted).
 
 
 17
 Initially, a plaintiff must establish a prima facie case of age discrimination by showing that: "(1) he was in the protected age group, (2) he was performing to his employers' legitimate expectations, (3) he was discharged, and (4) younger employees were treated more favorably." Roper v. Peabody Coal Co., 47 F.3d 925, 926 (7th Cir.1995). If a plaintiff "successfully states a prima facie case, the burden shifts [to the employer] to articulate a legitimate, non-discriminatory reason for discharging him." Collier v. Budd Co., 66 F.3d 886, 889 (7th Cir.1995) (citations and quotations omitted). "An employer that has proffered a legitimate, non-discriminatory reason for the discharge is entitled to summary judgment unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." Id. (citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993) (quoting McDonnell Douglas, 450 U.S. at 253).
 
 
 18
 In order to establish pretext, a plaintiff must demonstrate "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his] discharge, or (3) that [the reasons] were insufficient to motivate [the] discharge." Collier, 66 F.3d at 892 (quotation omitted, alteration in original). The plaintiff, through his pleadings, depositions and evidence, "must create an issue as to whether the employer honestly believes in the reasons it offers, not whether [the employer] made a bad decision." Sample v. Aldi Inc., 61 F.3d 544, 549 (7th Cir.1995) (Quotation omitted). "The plaintiff must specifically refute the facts which allegedly support the employer's proffered reasons." Collier, 66 F.3d at 893 (citations and quotation omitted).
 
 
 19
 For the purpose of summary judgment, Maclean has conceded that Wittwer has established a prima facie case of age discrimination. As a legitimate, non-discriminatory reason, Maclean has argued that after the reorganization, Bold and Dimond determined that Wittwer was not the best qualified person to fill the new sales position as midwestern representative for Construction and Concrete.
 
 
 20
 Wittwer argues that Maclean concocted the excuse of the reorganization scheme as a ploy to get rid of him because in the past, when sales territories shifted, it was never called a reorganization or restructuring. The plaintiff alleges that other than a minor shift in territory, Shane performed the same job that he did, and that the only change in personnel resulting from the alleged reorganization was that he was fired and Shane was hired.
 
 
 21
 Contrary to Wittwer's assertions, the record reveals that there was a complete restructuring of the midwestern and northeastern assignments within the sales department. Prior to the reorganization, Wittwer was responsible for selling advertising space in Concrete magazine in the states of North Dakota, South Dakota, Nebraska, Minnesota, Illinois, Wisconsin, Iowa, Missouri and Kansas, and ads for Construction in North Dakota, South Dakota and Nebraska. Wittwer's allegation that Shane performed the same job that he did was inaccurate, for she was given the additional responsibility of securing advertisers for Concrete in the states of Michigan and Indiana, and for Construction in Illinois, Kansas, Iowa, Missouri, Michigan, Indiana and Ohio. Furthermore, Wittwer used to sell ads in Coal Magazine, Engineering and Mining Journal, and Rock Products, but Shane had no duties for these magazines, proving that Maclean truly did consolidate advertising responsibilities and that Shane did not perform the same job as Wittwer.
 
 
 22
 In addition to altering Wittwer's position, Maclean also consolidated the duties of its other sales representatives. Ray Burchett, who was over the age of sixty, was assigned exclusive midwest sales responsibility for Rock Products, and Frank Gray, also in his sixties, was assigned the midwest region for Coal and Engineering and Mining Journal. The northeastern United States and eastern Canadian region also underwent substantial changes. JJH & S, an advertising company that Maclean employed as an independent sales representative, was relieved of its sales duties for Rock Products and Concrete in the northeast, the Cleveland sales territory was subdivided, a new sales territory for Construction was created in the northeast and Canada which included the previous Cleveland region, and Maclean hire Tom Judson to sell advertising for these three magazines in the new territory.
 
 
 23
 Wittwer also argues that his job performance was not so deficient that it constituted a legitimate, non-discriminatory reason to terminate his employment even if the department was reorganized and his job was altered as a result. In support of his assertion he points out that not once during his twelve years of employment with Maclean, did he ever receive a written performance review, nor was he told orally or in writing that he was not performing up to expectations, nor was he warned that his job was in jeopardy. The plaintiff attributes his disproportionately large decline in sales to the fact that he competed with six other magazines for customers, whereas Burchett had only one competitor, while Gray had none. He also points out that sales as a whole were declining because of the recession.
 
 
 24
 Although Wittwer maintains that his job performance was satisfactory, we note that he was the only sales representative in the Group who failed to receive a merit increase, or any increase in his base pay, over the ten years preceding his dismissal. His sales had been declining for three years, with the sharpest decline in 1992, the year he was dismissed. Thus, the district court properly agreed with Bold's and Dimond's explanation, based on their reasoned business judgment, that Wittwer was not performing his job in a satisfactory manner at the time of his discharge.
 
 
 25
 When an employer cites poor job performance as a reason for terminating an employee, we not only look to the individual's employment history, but must pay particular attention to the employee's performance at or about the time of his termination. Karazanos, 948 F.2d at 336 (quotations omitted) "Whether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time." Id. Maclean may not have discharged or criticized Wittwer prior to the reorganization, but once Construction magazine became the primary sales responsibility for his position, his declining performance became more troubling in light of the fact that Bold and Dimond lacked confidence in his ability to take advantage of Construction's growth potential.
 
 
 26
 We agree with the trial judge's finding that the plaintiff was not the most qualified person, as asserted by Maclean, to assume the new sales position for Construction and Concrete magazines. The evidence demonstrates that Wittwer's performance was below par as demonstrated by Dimond's deposition testimony that the plaintiff's advertising revenue declined more precipitously than that of any other sales representative in the group. Additionally, Bold and Dimond also observed the plaintiff in action, taking the opportunity to evaluate his selling techniques and customer relations, and were not impressed.
 
 
 27
 In Wittwer's deposition, filed with the motion for summary judgment, he disagreed with their assessment of his methods. While it is true that "nonmoving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion," Courtney v. Biosound, Inc., 42 F.3d 414, 418 (7th Cir.1994), "conclusory statements in [the plaintiff's] affidavit [or deposition] do not create an issue of fact." Sample, 61 F.3d at 549 (citations omitted); see also, Dev v. Colt Const. & Development Co., 28 F.3d 1446, 1460 (7th Cir.1994) ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability.") (quotation omitted). Wittwer "must do more than challenge the judgment of his superiors through his own self-interested assertions ... The employee's perception of himself ... in not relevant. It is the perception of the decision maker which is relevant." Karazanos, 948 F.2d at 337-38 (quotation omitted, alteration in original).
 
 
 28
 We have stated that in employment discrimination cases, this court "does not sit as a super-personnel department that reexamines an entity's business decisions." Sample, 61 F.3d at 551 (quotation omitted); see also McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir.1992) ("Even if the performance concern was a complete mistake, even if [the plaintiff] was the best possible person for the job, so long as [the defendant] honestly believed he was not, its business judgment will not be second-guessed by federal courts applying the ADEA.") "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," ADEA is not a remedy for those practices. Sample, 61 F.3d at 551 (quotation omitted). We can only assume that, in spite of the fact that Wittwer was the only Maclean sales representative who failed to receive a pay raise during the ten years preceding his termination, he claimed to be surprised by his discharge in light of the fact that he never received a formal negative performance evaluation. ADEA does not provide a remedy for Bold and Dimond's failure to warn Wittwer of any performance deficiency, absent evidence of age discrimination on the part of Maclean.
 
 
 29
 In Sample, we examined a case in which after the plaintiff was caught telling a falsehood to one of his superiors, he was neither disciplined nor fired over the incident, and it was never memorialized in his personnel file. 61 F.3d at 549. He was eventually terminated and his employer cited his lack of integrity and professionalism as legitimate, non-discriminatory reasons. Id. Sample argued that the fact that he was not disciplined or fired when caught misleading his supervisor established that his lack of integrity was a pretextual reason, designed to hide the fact that he was dismissed because he was of African descent. Id. We dismissed Sample's contention stating "So what? Sample does not dispute that these incidents occurred, and he has not created an issue of fact as to whether either incident undermined [his employer's] confidence in his integrity." Id. Similarly, the fact that Wittwer was not made aware of the concerns with his performance fails to create an issue of material fact as to whether Bold and Dimond decided that he was not the appropriate person to fill the new sales position.
 
 
 30
 Wittwer also argues that Maclean offered what he considers to be inconsistent reasons for his termination, thereby establishing that those explanations were pretextual. When he was dismissed, Bold and Dimond informed the plaintiff that it was because the sales department was reorganized, and he alleges that Maclean gave this same reason to the IDHR. Then, once the case proceeded to summary judgment, Wittwer asserts that for the first time in these proceedings, Maclean cited his job performance as another reason for his termination. The plaintiff relies on the Second Circuit's opinion in E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2nd Cir.1994), for the proposition that when a defendant offers "inconsistent explanations" for its termination of an employee, a reasonable jury could find that those reasons are pretextual.
 
 
 31
 In Ethan Allen, Hugh Pierce, a sixty-four year old man, was laid off from his position as a special projects engineer. Id. at 118. Pierce filed a charge of age discrimination with the Vermont Attorney General's office and the EEOC. Id. The EEOC brought the claim on his behalf. The Vermont Attorney General's office assigned an inspector to investigate Pierce's claim, and Ethan Allen's director of personnel informed the inspector that the sole reason for Pierce's layoff was that the workload for his position had decreased to a point that it no longer made sense to employ a special projects engineer. Id. The director also asserted that none of Pierce's projects were reassigned to other employees, and that Pierce's job performance was not a factor in his termination. Id.
 
 
 32
 However, the inspector discovered that many of Pierce's projects were reassigned to a "significantly younger employee," and that when confronted with this fact, the plant manager stated that Pierce, although qualified for the position, was not as qualified as the younger employee because he had "an aversion to travel and paperwork." Id. The manager also admitted that he did not follow Ethan Allen's written layoff policy to guide his decision to terminate Pierce's employment. Id. At trial, however, the personnel director testified that the abilities of Pierce and the younger employee were thoroughly compared, using the written layoff policy as a guideline for the evaluation, and that he (the director), the plant manager, and another supervisor, determined that the fact was that the younger employee was better suited for the job, in all probability because he had previous experience as a plant manager. Id. at 118-19, 120. The court held that "[f]rom such discrepancies a reasonable juror could infer that the explanations given by Ethan Allen at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation." Id. at 120.
 
 
 33
 The instant case is distinguishable from Ethan Allen, however, because at every stage of these proceedings, Maclean offered the consistent business related explanation that the sales department was reorganized, and after Wittwer's position was altered and his job performance was evaluated, his superiors determined that he was not the most qualified person to fill the new position. Although Wittwer asserts that his poor performance was not cited as a reason for his dismissal to the IDHR, in response to a questionnaire the IDHR gave Maclean during its investigation of the plaintiff's claims, Maclean stated that "there is no basis for Complainant's assertion ... that he was performing his job in a satisfactory manner. Sales for which Complainant was responsible for were dropping at an alarming rate." Furthermore, when Wittwer was informed of his dismissal, it is likely that Bold and Dimond provided him with as benign a reason as possible, in order that his chance of finding a new job would be unhampered by a poor performance review. Once Wittwer filed suit against Maclean, it had no choice but to fully explain its reasoned business decision to terminate Wittwer, making clear the fact that his poor selling skills and declining sales were a factor in his dismissal.
 
 
 34
 The undisputed facts establish that Wittwer was terminated only after his superiors had reorganized the sales department and consolidated the sales position for two magazines into one job. In addition, thereto, it was based on the fact that because of his slipping performance, poor selling skills, and lack of contacts in the construction industry, he lacked the attributes necessary to successfully sell advertising in Construction, which according to Maclean, became the principal selling responsibility in the new territory. These are legitimate, non-discriminatory reasons for Wittwer's discharge, and are contradicted only by his own self-serving declaration that he was capable of performing the new job. As we have stated, the plaintiff's self-serving assertions will not defeat the motion for summary judgment, Dey, 28 F.3d at 1460, and we will defer to Maclean's assessment of Wittwer's abilities and his suitability for the new position because "ADEA is not the vehicle for reviewing the propriety of business decisions." Courtney, 42 F.3d at 423.
 
 
 35
 Similarly, we refuse to second-guess Bold's and Dimond's judgment about Shane's qualifications. The record on appeal fails to reveal evidence in support of Wittwer's contention that Shane could not handle the job. She had close ties to the construction industry, having worked in the business for at least six years prior to joining Maclean, and having served on the marketing committee of CIMA, the principal trade organization for the construction industry. Her contacts in the industry made her an excellent candidate to expand the advertising clientele for Construction.
 
 
 36
 Furthermore, Dimond and Bold had great faith in Shane's ability to network and interact with people in the construction business, as well as selling and promoting the magazines, for during her tenure with Allied she managed to have her company placed on seven magazine covers in five years. In her deposition, Shane explained the significance of this accomplishment: "Magazine covers can't be bought. It is simply through networking with people and preparing the right information and getting it to the right people and ... establishing yourself as a resource to help them." Shane also maintained a contact list of all the people she dealt with from these magazines, which were further resources she brought with her to Maclean.
 
 
 37
 Finally, in her prior position, Shane purchased advertising space from sales representatives like Wittwer. Although the plaintiff attempts to use this fact to demonstrate that Shane was without selling experience before she came to Maclean, during oral argument defense counsel astutely pointed out that just as years of practicing law is excellent preparation for a position on the bench, years of purchasing advertising is excellent training for selling advertising. Shane's experience as a buyer of advertising space in construction magazines gave her insight into how to organize and carry out an effective sales pitch to prospective clients for Maclean's magazines.
 
 
 38
 Wittwer contends that the fact that Maclean's personnel manager had hand-written Shane's date of birth on the top of her employment application is further evidence of its discriminatory intent. This fact is of little or no consequence, for the undisputed evidence establishes that the personnel manager had nothing to do with the decision and that Bold and Dimond were the only two people who participated in the decision to terminate Wittwer's employment. Because the personnel manager had no input, any notations she may have made on Shane's application bear no relevance whatsoever to Wittwer's claim.
 
 
 39
 We are likewise convinced that Wittwer's argument that his age was the office joke establishes pretext is unavailing because the only people who admitted to making jokes and comments about Wittwer's age were Burchett and Gray, both of whom believed they were older than Wittwer, and neither of whom participated in the decision to dismiss the plaintiff. It is well-settled that "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." Fortino v. Quasar Co., 950 F.2d 389, 395 (7th Cir.1991) (collecting cases); see also, Courtney, 42 F.3d at 419; Aungst v. Westinghouse Elec. Corp., 937 F.2d 1216, 1221 (7th Cir.1991) ("Statements made by inferior employees are not probative of an intent to discriminate by the decision maker"). Additionally, Wittwer failed to produce evidence to suggest, much less confirm, that either Bold or Dimond ever made any age related comments concerning him, nor does the record reveal any evidence that they even knew about the jokes. Lastly, the mere fact that the jokes were made does not imply that Wittwer's age was a liability; they just establish that his co-workers thought that he looked much older than he said he was.
 
 
 40
 Wittwer's last allegation of pretext is that Jean Miller, the only other Maclean employee who was over the age of 70, was terminated when she refused to take a job that would reduce her salary by more than one-half. The plaintiff argues that her discharge establishes that Maclean wished to get rid of its oldest employees. However, as the district judge properly concluded, Miller was dismissed a year and a half after Wittwer left Maclean, and the events are too remote in time to be related to each other. Furthermore, Miller's affidavit neither states nor implies that either Bold or Dimond played a part in the decision to terminate her employment.
 
 
 41
 The following uncontested evidence also demonstrates that contrary to Wittwer's allegations, Maclean was not engaged in a concerted effort to rid itself of its older employees: (1) at the time Wittwer was fired, Maclean believed that he was 63 years of age and that Burchett and Gray were both older than he was; (2) in his deposition, Dimond testified that in August of 1992, four Chicago sales representatives (including Bold and Dimond) were over the age of sixty and one was in his fifties, and that two Atlanta sales representatives were also in their fifties.
 
 
 42
 In response to Wittwer's allegation of pretextual reasons, the record is barren of any disputed facts from which a jury could infer that Maclean's reasons for terminating Wittwer "had no basis in fact," "did not actually motivate the discharge," or "were insufficient to motivate the discharge." Collier, 66 F.3d at 892. The plaintiff's sales of advertising space were declining at a greater rate than those of any other representative's in the Mining and Construction Group at Maclean and he had no potential new clients for International Construction magazine. After the sales position that Wittwer formerly held was restructured to include the midwestern sales responsibility for Construction, Bold and Dimond decided that he was not the most qualified person to perform the job, and terminated his employment. Maclean's reasons for dismissing Wittwer were consistent throughout these proceedings and therefore, not pretextual.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 As Maclean writes in its motion for summary judgment, "consultive selling involves more listening than talking. It involves finding out what the customer's needs and concerns are and helping the customer address those needs." This approach requires representatives to gain an understanding of their customers' businesses and the markets in which they operated in order that they might develop customized marketing programs to suit clients' needs
 
 
 [2]
 Wittwer claimed that he had a difficult time finding employment and was given more interviews when he told prospective employers that he was in his forties, after he lost his job at Rudder Magazine at the age of 62. Thus, he alleged that he was less than truthful and informed Maclean that he was younger than he actually was in order to improve his chances of obtaining a position in the company. Once he was hired, he stated that he persisted in his falsehood for fear that he would be fired if the company discovered his real age. In his response to the defendant's statement of material facts, Wittwer admitted his age