Beverly **BOWERS**, Plaintiff,

v.

**RADIOLOGICAL SOCIETY OF NORTH AMERICA, INC., and Dana Davis, individually, Defendants.**

**No. 98 C 7431.**

United States District Court, N.D. Illinois, Eastern Division.

June 12, 2000.

Penny Nathan Kahan, Penny Nathan Kahan & Associates, Ltd., Chicago, IL, Elena M. Dimopoulos, Law Offices of Edward T. Stein, Chicago, IL, for Plaintiff.

Michael G. Cleveland, Vedder Price Kaufman & Kammholz, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Beverly Bowers was fired from the Radiological Society of America (the "Soci-ety"), in Chicago, Illinois, in 1998. She sued under Title VII, claiming that her immediate supervisor, Dana Davis, subjected her to sexual harassment before and during her employment at the Society from 1994 to 1998, and had Ms. Bowers fired because she would not give in to her sexual demands. The Society moves for summary judgment, and I deny the motion.

I.

Ms. Bowers and Ms. Davis met in Ohio in 1993.[1] Ms. Bowers wanted to work for the American Health School Association (the "Association"), where Ms. Davis was Chief Executive Officer. They had dinner, and Ms. Davis talked about sex and made a pass at her, which Ms. Bowers declined. Ms. Davis came by a few days later and tried again, unsuccessfully, to seduce Ms. Bowers. In March 1994, Ms. Bowers took a job at the Association, where Ms. Davis continued to talk dirty and make sexual advances. In the fall of 1994, Ms. Davis took a new job as Assistant Executive Director of the Society, and asked Ms. Bowers if she would be interested in a job there. Despite Ms. Davis' continued unwanted attentions, she was. When Ms. Bowers visited Chicago for an interview in November, she stayed with Ms. Davis, although she was not comfortable with the arrangement. Ms. Davis suggested that they live together until Ms. Bowers found a home of her own. At the interview Ms. Bowers asked Ms. Davis if she would continue to make advances. Ms. Davis said that she would not. Ms. Bowers took the job. Despite her misgivings, she moved in with Ms. Davis in early December 1994, along with another former co-worker from the Association now also at the Society, David Laubert. Mr. Laubert and Ms. Bowers lived in separate bedrooms upstairs; Ms. Davis lived downstairs.

---

1. The Society says that many of the facts as recited in this opinion are disputed but does not contest them for purposes of this motion.

However, in early January 1995, Ms. Davis began making passes again, saying that she wanted to have sex to with Ms. Bowers. Ms. Bowers moved out in May 1995. At work, Ms. Davis harassed Ms. Bowers physically, pressing up against her in an unwanted way. She would talk dirty at the office, announcing to all, for example, that if Mr. Laubert behaved himself, she would let him play "hide the weenie"; she referred to a "Gravitron" machine at the gym as the "Gravitwat," and drafted rules for the 1995 office Christmas party that said participants could earn points for giving a blowjob. Other women employees testified that Ms. Davies' speech was embellished with terms such as "fuck," "blowjob," "pussy," "cunt," and "bitch"; she recounted lewd jokes, and inquired into "who got laid this weekend," she initiated tongue kissing games at the 1995 office Christmas party, and encouraged a woman employee to moon a male employee.

After Ms. Bowers repeatedly rejected Ms. Davies' passes, Ms. Davies became hostile. She gave Ms. Bowers a negative performance review after Ms. Bowers moved out of her house in May 1995, and told her that she "better learn to get on with [her] or else." Ms. Davis also refused to communicate with Ms. Bowers on projects, and was harsh and critical whenever Ms. Bowers spoke to her. In July 1995, Mr. Laubert was promoted and Ms. Bowers' title changed, but her benefits and wages were not affected. However, her assigned responsibilities became increasingly narrow, and Ms. Davis refused to give her new responsibilities. When Mr. Laubert quit in August 1997, Ms. Davis discouraged Ms. Bowers from applying for his job because (she said) Ms. Bowers was not capable of supervising staff.

Several women employees testified that senior Society management knew about and condoned Ms. Davis' inappropriate and crude behavior even when it was displayed at senior management meetings. When Ms. Bowers' coworker Beth Buttina told Mark Watson, another Assistant Executive Director, that Ms. Davis' conduct was embarrassing, he said, "[G]et used it it, that's Dana."

In August 1995, Ms. Davis was made the Society's Director of Administration, the person to whom employees would bring a sexual harassment complaint, and she remained in that position until February 1998. Several women employees testified that they felt they could not bring complaints to Ms. Davis. Ms. Bowers herself feared to go over Ms. Davis' head to the Society Executive Director, Delmar Stauffer, because he had made it clear to her that he supported Bowers and himself initiated sexualized conduct. In October 1997, when David Seck was made her boss, Ms. Bowers complained to him about Ms. Davis' rejected advances and subsequent mistreatment, but Mr. Seck told her that the problem was between the two of them, and he would not take it up with Ms. Davis. Ms. Bowers was fired in February 1998.

## II.

### A.

Title VII bars harassment directly linked to an economic quid pro quo. Such "quid pro quo" harassment occurs where submission to sexual demands is made a condition of tangible employment benefits. *Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir.1996). Title VII also bans "conduct that unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Hostile environment claims are evaluated against both an objective and subjective standard. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir.1991). The terms "quid pro quo" and "hostile work environment" are "helpful ... in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but

beyond this are of limited utility." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Not every unpleasant workplace is a hostile environment. "The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" would be neither pervasive nor offensive enough to be actionable. *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). The workplace that is actionable is the one that is "hellish." *Id.* However, behavior that by itself was not extreme or frequent enough to trigger a hostile work environment claim may become actionable as sexual harassment if it involves a threat of adverse employment action that is carried out. As I have said elsewhere, "quid pro quo harassment is neither necessary nor sufficient for a hostile work environment claim. But, in the appropriate circumstances, it may help make other conduct severe enough to constitute a hostile work environment." *Faccio–Robert v. Empress River Casino,* 80 F.Supp.2d 918, 920 (N.D.Ill.2000).

### B.

The Society argues that I should not consider Ms. Bowers' allegations of bad conduct before July 5, 1997, 300 days before Ms. Bowers filed her EEOC claim. I have rejected this in an earlier opinion, *Bowers v. Radiological Society of North America,* 98 F.Supp.2d 951 (N.D.Ill. 2000). The Society then urges that even if I do consider these facts, they are not actionable. First, it says, conduct that occurred outside work, in a private home the two voluntarily shared, is not the Society's fault. Second, it argues the misconduct at work, specifically "when speaking to [Ms. Bowers] about a project, leaning over [Ms. Bowers'] back and pressing her breasts and body against [Ms.] Bowers" was not severe enough for actionable harassment; and giving Ms. Bowers the cold shoulder for rejecting her attentions was likewise not enough.

■ I agree that the Society is not responsible for Ms. Davis' conduct in her own home, but that conduct may be relevant to an employment claim: If Ms. Davis took out at work antagonisms in part arising from her frustrations with Ms. Bowers occurring at home as well as work, then Ms. Davis' propositioning Ms. Bowers cannot be excluded merely because it occurred away from work. It was part of a pattern the consequences of which came to bear on the job.

Ms. Bowers, moreover, concedes that the pre-July 5, 1997 conduct was not in itself severe and pervasive enough to constitute sexual harassment; that is why she did not sue earlier. But I have explained that she can bring in that conduct on a continuing violation theory, because it was part of a pattern that could only be recognized as actionable in light of later events that occurred within the limitations period, *Bowers,* 98 F.Supp.2d at ——–—— (*citing Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 396 (7th Cir.1999)), and also on the ground that Ms. Davis' conduct, although not in itself actionable, could become actionable hostile environment harassment in light of the subsequent quid pro quo harassment. *Bowers,* 98 F.Supp.2d at ——. Here, according to Ms. Bowers, Ms. Davis told Ms. Bowers, after Ms. Bowers rejected her and moved out of her house, that she "better learn to get on with [her] or else"; and then participated in Ms. Bowers' firing.

### C.

With regard to the incidents after July 5, 1997, the Society argues, first, that Ms. Bowers cannot show that she was harassed at work on account of her sex, because Ms. Davis was an equal opportunity harasser who was just as crude, vulgar, obnoxious, and offensive to men as to women. *See Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1145 (7th Cir.1997) (no harassment if environment not more hostile for women than for men). The Society argues

that there is no evidence that Ms. Davis' burbling fountain of profanity was directed at any particular sex, because there was testimony that a male coworker was also offended.

But there is such evidence, including (1) testimony that Ms. Davis sought a sexual relationship with Ms. Bowers, which, though not itself actionable insofar as it occurred outside work, nonetheless goes to whether a woman who received such attentions might reasonably find the persistent sexual innuendo at work to be hostile and abusive in a discriminatory way. Moreover, the allegations that Ms. Davis physically pressed herself against Ms. Bowers at work is also evidence of sex harassment. It matters that Ms. Bowers was specifically targeted. *See Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180, 1183 (7th Cir.1986) (sexual harassment when victim was "a favorite target" of filthy talk and sexual fantasies). There is no evidence that Ms. Davis did this sort of thing with male employees.

■ (2) Ms. Bowers argues that the specific content of Ms. Davis' verbal invention ("cunt," "bitch," "pussy") was heavily "gendered." "Sexual epithets often directed at women, such as 'cunt' and 'bitch,' clearly reflect the gender-based nature of the animus that motivates them." L. Camille Hebert, *Sexual Harassment is Gender Harassment,* 43 *U. Kan. L.Rev.* 565, 574 (1995) (*cited in Doe v. City of Belleville,* 119 F.3d 563, 577 (7th Cir.1997) (*judgment vacated on other grounds by* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313)). Although Ms. Davis used neutral terms applicable to both sexes ("fuck," "blowjob"), there is no evidence that Ms. Davis used male gendered profanity nearly as much as she used its female gendered counterparts. This raises a genuine issue of material fact about whether there was discriminatory harassment.

Second, the Society argues that Ms. Davis' conduct cannot have been really offensive to Ms. Bowers because Ms. Bowers put up with it. *See Dey v. Colt Const.*

*& Development Co.,* 28 F.3d 1446, 1454 (7th Cir.1994) ("If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of [her] employment, and there is not a Title VII violation."). In support of this, the Society notes that Ms. Bowers sought employment under Ms. Davis, stayed in her house for the interview, took the job, and even lived with her for a time. However, it is not the law that a victim of harassment must quit at once, sacrificing a job she may love or a career in which she has a stake if she wishes to maintain a sexual harassment lawsuit.

■ A range of reasonable responses to hostile environment harassment is compatible with subjective hostility:

> The employee may quit "cold turkey" or . . . may experience a prolonged period of turmoil in which the individual regularly avoids the workplace for fear of suffering further harassment. Alternatively, an employee may react angrily to the . . . hostility, and may more easily be provoked into arguments or physical altercations with those co-workers responsible for the harassment.

*Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1272 (7th Cir.1991). In another case, a plaintiff "maintained a close relationship with [the supervisor]" for over two years. *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1454 (7th Cir.1994). She had considered buying his automobile, had asked him for legal advice on a personal matter, and had gone to him for protection when a male friend's wife unexpectedly appeared at the office. *Id.* This did not mean, however, the plaintiff was not offended as a matter of law:

> Although she indicated in her deposition that [the supervisor's] daily sexual banter did not prevent her from fulfilling her responsibilities in a timely fashion, she also stated that the conduct upset and embarrassed her, and made her feel uncomfortable. Indeed, . . . on more than one occasion, [his] comments

caused her to walk out of his office. Although she tolerated the conduct for over two years because she feared for her job, [the plaintiff] also indicated that she just wanted the comments to stop. *Id.* Ms. Bowers' evidence, which, as noted, *Bowers,* 98 F.Supp.2d at —— – ——, includes voluminous journal entries complaining about Ms. Davis' behavior, 'is at least sufficient to create a factual issue on the question of whether [she] subjectively perceived her work environment to be hostile and abusive.' *Dey,* 28 F.3d at 1454.

■ Third, the Society argues that it was not actionable for Ms. Bowers to give Ms. Davis the cold shoulder in her last year of work. It is somewhat difficult to determine just what the Society means when it states that "Davis' conduct was physically aggressive, [but] not sexual in character" that year. Therefore I cannot say whether the cases the Society cites are apposite. However, although a cold shoulder is not actionable, even if it is due to a rejected pass, causing someone to be fired for rejecting a pass is indeed actionable. Ms. Bowers has brought forward enough evidence that she was fired because she would not accede to Ms. Davis' sexual importunities, or because she complained about them to the Society, to bring the matter to a jury.

Fourth and finally, with respect to Ms. Bowers' quid pro quo theory, the Society contends that "it is undisputed" the termination decision was made by Delmar Stauffer, the Society's Executive Director, alone and without Ms. Bowers' input, and solely on nondiscriminatory grounds of economy. Moreover, the Society argues that the three years between Ms. Bowers' rejection of Ms. Davis' advances and the decision to fire her creates too great a gap for an inference that the two are casually connected.

■ But it is disputed that Mr. Stauffer made the decision alone. Ms. Bowers offers evidence that Mr. Stauffer had no first hand knowledge of her work, discussed the decision with Ms. Davis, agreed that Ms. Bowers' job could be "readily" outsourced, told him that she was incapable of supervising people, and stated that there was no other job at the Society that she could perform; and, finally, was involved in drafting Ms. Bowers' termination letter. Ms. Davis denies many of these claims, but since they are material issues of fact, this is a jury question. The Society asserts that she offers no evidence that the Society's economic reason for firing Ms. Bower's was pretextual, but a jury could believe that if Mr. Stauffer relied for an evaluation of the staffing needs and Ms. Bowers' capabilities on a harassing supervisor with a sexual grudge, it might well conclude that the rationale was pretextual.

The defendants offer no case law that three years is too long a gap for causation. In a retaliation context, the Seventh Circuit has held that "five or ten" years is not too long "if the plaintiff has evidence from which one may reasonably infer that her . . . employer waited in the weeds" to ambush her. *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 891 n. 6 (7th Cir.1996). A rational jury might believe that Ms. Davis waited until an opportunity presented itself to bushwack the former object of her desire.

### III.

The Society's motion for summary judgment on Ms. Bowers' claims is DENIED.